# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

**People v. Willis**, 2013 IL App (1st) 110233

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARSENIO WILLIS, Defendant-Appellant. |
| District & No. | First District, Third Division<br>Docket No. 1-11-0233 |
| Filed | September 30, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal, defendant, a juvenile charged with first degree murder and aggravated battery committed when he was 16 years old, failed to establish that the provision of the Juvenile Court Act requiring the automatic transfer of 15- and 16-year-olds charged with certain Class X felonies to criminal court was unconstitutional, and the record showed defendant's guilt under an accountability theory was proven beyond a reasonable doubt and that the prosecutor's closing arguments were within the bounds of reasonable argument; however, the cause was remanded for a *Krankel* hearing on defendant's claims of ineffective assistance on the part of his trial counsel and a determination of whether new counsel should be appointed to review those claims. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 08-CR-12569 (02); the Hon. William G. Lacy, Judge, presiding. |
| Judgment | Remanded with directions. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Darrel F. Oman, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg and Peter Maltese, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.

Justices Neville and Pucinski concurred in the judgment and opinion.

## OPINION

¶ 1     Sixteen years old at the time the crime was committed, defendant Arsenio Willis was tried as an adult as required under the Illinois Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)). Section 5-130 of that Act mandates automatic transfer to criminal court of 15- and 16-year-olds charged with certain Class X felonies. A jury found Arsenio guilty of first degree murder with a firearm and aggravated battery with a firearm (accountability). The trial court sentenced him to 63 years in the adult prison system. A crucial issue in this appeal is the constitutionality of section 5-130 of the Juvenile Court Act (705 ILCS 405/5-130 (West 2010)), particularly following three recent United States Supreme Court cases recognizing the fundamental differences between juvenile offenders and adults.

¶ 2     Arsenio also argues:

     (i) the State failed to prove him guilty beyond a reasonable doubt;

     (ii) the State's closing argument prejudiced him by misrepresenting the level of proof required to find him accountable, disparaging his counsel, and misrepresenting the evidence;

     (iii) his 63-year sentence is unconstitutionally excessive and disproportionate to his codefendant's 53-year sentence; and

     (iv) the trial court failed to make a *Krankel* inquiry (*People v. Krankel*, 102 Ill. 2d 181 (1984)) into his counsel's allegation of his own ineffectiveness.

¶ 3     Although we find the precedent regarding the constitutionality of the Juvenile Court Act's automatic transfer troubling, we choose to follow it at this time because the recent United States Supreme Court cases on which Arsenio relies do not convince us otherwise. In addition, we affirm Arsenio's convictions for first degree murder and aggravated battery with a firearm (accountability). The evidence, when viewed most favorably to the prosecution, supports a finding of guilt beyond a reasonable doubt on both of Arsenio's convictions. Two eyewitnesses identified Arsenio and his codefendant as the only individuals

with guns and as firing the guns at the time the victims were shot.

¶ 4        As to the State's closing arguments, we find the State adequately confined its arguments to the evidence and the reasonable inferences to be drawn from that evidence. Nor did the State misrepresent the burden of proof or the evidence and did not disparage Arsenio's counsel. And, based on the trial court's comments during sentencing, we uphold Arsenio's sentences as a proper exercise of the sentencing court's discretion.

¶ 5        Finally, following a thorough review of the record, we hold the trial court failed to conduct a preliminary inquiry into the factual basis of Arsenio's posttrial claim of ineffective assistance of trial counsel as required by *Krankel*. The trial court should have engaged in a discussion with Arsenio or, considering Arsenio's age, his defense counsel concerning the defense counsel's claim and later, the spontaneous withdrawal of that claim. We remand for a *Krankel* hearing.

¶ 6                                    Background

¶ 7        Defendant Arsenio Willis and codefendant David Hill, both 16-year-olds, were charged with four counts of the first degree murder of Romaz Lucas and one count of attempted first degree murder of Charles Barrows. Arsenio and Hill were tried in simultaneous jury trials. Arsenio was found guilty of first degree murder with a firearm and aggravated battery with a firearm. He was sentenced to consecutive terms of 33 years for the first degree murder conviction, with 15 years for statutory firearm enhancement, and 15 years for aggravated battery with a firearm conviction.

¶ 8        A cousin of Romaz Lucas, Romeo McCollum, testified that on the morning of May 16, 2008, he, Lucas, and Charles Barrows went to McCollum's grandmother's house at 5347 West Race where, along with others, they played dice on the patio in the backyard. Around 3 p.m., Arsenio, Hill, and Demario Williams arrived. Lucas asked Williams for the $100 that he claimed Williams owed him. Hill stepped in and told Lucas that he "wasn't getting nothing." McCollum, facing Hill, saw Hill pull out a gun. Lucas told Hill to put the gun down and, "Let's fight like men." McCollum testified that Hill's gun was nearly parallel to the ground and pointed at Lucas at the time of Hill's first shot. Lucas tried to wrestle the gun away from Hill, when another shot went off, but McCollum could not tell who fired it.

¶ 9        McCollum testified that Arsenio had been sitting on the stairs by the gate when the fight began. McCollum saw Arsenio fire his gun at Lucas while Lucas lay on the ground, and Arsenio fired more than once. On hearing gunshots, the occupants of the backyard scattered in all directions. As McCollum tried to help the mortally wounded Lucas, he saw Hill running away along with Arsenio.

¶ 10       McCollum testified he saw no one with a weapon other than Hill and Arsenio. He could not recall if more shots were fired after he ran to Lucas. But, when confronted with his grand jury testimony, he acknowledged he may have told the grand jury that while leaning over Lucas, he heard a few more shots come from the same area as the original shots. The day after the shooting, McCollum identified Arsenio and Hill in separate photo arrays as "the guys that shot [his] cousin."

¶ 11       Charles Barrows testified that he was playing dice in the backyard, and although he was

not paying attention to the conversations, recalled hearing something said about Williams owing Lucas money. Burrows testified Hill interjected himself into the conversation before pulling a gun from his pocket, precipitating a fight between Hill and Lucas, with Lucas struggling to get the gun out of Hill's hand. The gun fired while pointed toward Lucas's legs. Everyone scattered, said Barrows, and additional gunshots went off. Burrows saw Arsenio "shooting in the yard," and believed Arsenio was trying to help his friend Hill get away. As Hill ran, Burrows saw Arsenio shooting at the people still there. He heard three gunshots.

¶ 12     Burrows testified that Arsenio fired the shot that hit the side of his body. Burrows ran out to the alley before collapsing and could not recall whether Arsenio stuck around or not. Burrows testified the only guns he saw in the backyard belonged to Arsenio and Hill. Burrows knew Arsenio had shot him because only Arsenio was shooting in the backyard at the time.

¶ 13     Detectives interviewed Burrows at the hospital, where his injuries required a month-long stay. From a photo array, Burrows identified Arsenio as the individual who shot him and Hill as the individual who first displayed a gun and fought with Lucas. In a lineup on June 15, 2008, Burrows identified Arsenio as the individual "shooting in the yard," and who shot him, and identified Hill as the individual who was "upping the gun."

¶ 14     Demario Williams testified that on May 16, 2008, while on his way home with his friend, Arsenio, they came across Hill who told Williams about the dice game. When he arrived at the dice game, Williams was wearing headphones, and he testified he did not initially hear what Lucas said to him. Williams recalled removing the headphones, and telling Lucas that he did not have the money to pay him back, but would pay when he did. At this time, Arsenio was sitting by the stairs leading to the back porch. Williams put his headphones back on, and as he was about to leave, saw Lucas approach Hill, and the two engage in a conversation. Hill had his hands in his pockets.

¶ 15     Williams saw Hill pull a gun from his right pocket as Lucas was "coming towards" him. Williams testified that before seeing the gun in Hill's hand, he did not know Hill had a gun. He said Hill raised his arm at a 30-degree angle, but did not point the gun at anyone. The last thing Williams heard before leaving the backyard was Lucas saying, "What do you need a gun for? We can fight." Williams said he heard nothing else due to the headphones. The last thing he saw before leaving the backyard was Lucas reaching for Hill's gun. Williams heard only one shot. He did not see Hill shoot Lucas or see Arsenio with a gun.

¶ 16     On the sound of a single gunshot, Williams ran toward his mother in the front yard, and at her request, went inside the house. The next day Williams identified Hill from a photo array.

¶ 17     Demario Williams's mother, Sheila Williams, testified that she lived with her four sons at the house. At 3 p.m., she was on her front porch with her sister, brother, some of her children, and neighbors when her son, Demario Williams, arrived with Arsenio and Hill. She told them about the dice game in the backyard. The front porch is about 15 feet from the alley where the backyard gate is located. About five or six minutes later, she heard a single gunshot come from the backyard and went into the alley on the side of the house toward the side gate to see what happened. There, she saw Demario, wearing his headphones, running

toward her. She told her son to go inside the house.

¶ 18    She saw Arsenio fall from her fence and, as he did, he turned his head and made eye contact with her. She testified the butt of the gun was in his right hand, which was elevated and moving. When she saw Arsenio fall, she did not hear a gunshot. She turned and went back toward her house, and that is when she saw someone, whom she could not identify, run to the back fence and try to climb over it. With her back toward the backyard, she heard a second gunshot. Then, a third and possibly a fourth. She testified that initially she heard one gunshot and later, a group of shots. She saw Lucas in the alley with her sister holding him in her arms; he had been shot. Rose Elam was standing next to them. She said she did not see Hill with a gun that day.

¶ 19    Sheila Williams was confronted with her grand jury testimony from June 11, 2009, in which she testified that she saw Arsenio fall with his right hand elevated and shooting toward the backyard. She testified she remembered the questions before the grand jury, but could not recall giving the answers. On cross, she admitted she testified before the grand jury that she saw Arsenio shooting a gun into the backyard.

¶ 20    The day after the shooting, Shelia Williams identified Arsenio and Hill in photographic arrays. She returned to Area 5 Headquarters on June 5, 2008, and identified Hill in a physical lineup as having been in her backyard on the day of the shooting. That same day, she spoke with detectives and an assistant State's Attorney (ASA) concerning what she had witnessed on May 16. The ASA asked permission to put her statement in writing, which at trial was identified by Shelia as People's Exhibit 17. Initially, Sheila said she did not recall saying in her statement that she saw Arsenio coming out of the gate backwards and seeing his arm jerking as he fired the gun. Despite testifying that she did say that to the ASA, she could not remember "what exactly happened at what particular time."

¶ 21    Shelia testified that Arsenio was a friend of her son's and often at her house. She admitted that she did not want anything "bad" to happen to Arsenio.

¶ 22    ASA Maryann Planey testified that on June 11, 2009, she spoke with Sheila Williams about the shooting, and brought her before the grand jury. Planey read to the jury from Shelia Williams's grand jury testimony, in which she testified that she saw Arsenio "falling out of the backyard with his right hand elevated," and "his arm was jerking [as] he was shooting toward the back of the yard." She also saw the handle of the gun.

¶ 23    Another witness, Rose Elam lived on the first floor of 5347 West Race. On May 16, around 3 p.m., she was in the front yard with her grandchildren when she saw two boys pass her and go to the backyard. She testified that three or four minutes later she heard a gunshot, and she ran to her grandchildren, telling them to get under the porch. Then she went toward the back of the house and, on her way, saw Sheila Williams, who was either in the back or heading that way. She also saw the same two boys coming toward her. Elam did not see anyone with them. Hill was running out of the back first, followed closely behind by the other boy.

¶ 24    The gunshots had stopped by the time Elam saw Hill running toward her. She heard only two gunshots. She saw a gun in Hill's hand as he tried to put it in to the side of his waistband; the other boy had a gun tucked down the side of his pants. Both boys went east

on Race Street. When she saw the bleeding Lucas running out of the yard, she went to help him. Elam also testified she had seen Hill playing with the same gun in the front of the house on both Monday and Friday the week before the shooting.

¶ 25 On May 20, 2008, Elam met with detectives at Area Five. She identified Hill and Arsenio from photographic arrays as the two boys she saw on May 16. She told the detectives that one of them was wearing a red jersey and the other, a black, hooded sweatshirt, at the time of the shooting, and that the one wearing the red jersey was trying to hide a gun. Elam told Detective Valkerner that after hearing the gunshots, she clearly observed the face of the boy wearing the red jersey as he walked past her, but did not see the face of the boy wearing the black sweatshirt. On June 5, 2008, Elam returned to Area Five and identified Hill in a lineup.

¶ 26 Following Elam's direct examination, defense counsel moved for a mistrial arguing Elam said Arsenio had a gun for the first time during her trial testimony. Defense counsel's motion was denied and the court advised counsel to cross-examine her on the issue if he wished.

¶ 27 Chicago police forensic investigator Peter Larcher testified he collected the physical evidence at the scene, including two blood swabs, one from the alley and one from the backyard; a cartridge case; and articles of clothing. The cartridge, which resembled a .22-caliber bullet, was unmarked and no latent impressions suitable for comparison were found. Chicago police evidence technician Hill Caldbeck testified that on May 17, he went to 5515 West Hirsh, an address other than where the shooting occurred, to recover a weapon which was inside a plastic bag lying in the alley. He recovered a revolver with three bullets.

¶ 28 Cook County Assistant Medical Examiner Valerie Arangelovich performed an autopsy of Lucas. He received two gunshots–a right chest wound and right thigh wound. Arangelovich recovered a deformed, medium-caliber bullet from Lucas's body. She found no evidence of close-range firing. Arangelovich opined the cause of Lucas's death was multiple gunshot wounds and the manner of death was homicide.

¶ 29 Forensic scientist Brian Parr was qualified as an expert in the field of firearm and tool mark identification. He examined the cartridge case recovered by Officer Larcher, the revolver recovered by Officer Caldbeck, and the bullet recovered by medical examiner Arangelovich from Lucas's body. Parr opined the recovered firearm was a .38 special caliber revolver and the fired bullet was not fired by the firearm. The fired cartridge case was of a .22-caliber long rifle.

¶ 30 The court denied Arsenio's and Hill's motions for directed verdicts. Both defendants declined to testify on their own behalf.

¶ 31 Arsenio entered into evidence the stipulated testimony of Detectives Toraskowitz, Valkner, and Gilger, and ASA Tristian. Detective Toraskowitz would testify that when he interviewed Elam on May 16, she did not say that Arsenio possessed a firearm or that she saw Hill with a firearm before the May 16 incident. Detective Valkner would testify that Elam did not tell him that she saw Arsenio with a firearm. Further, Detective Valkner would testify that Elam told him that when she saw Hill with a handgun, he was wearing a red jersey and attempting to conceal the handgun under his right armpit. Detective Gilger and ASA Tristian would testify that on June 5, 2008, Elam gave a written statement in their presence and that she did not state that she saw Arsenio with a firearm.

¶ 32    The jury found Arsenio guilty of first degree murder and aggravated discharge of a firearm. The jury also determined that Arsenio was armed with a firearm during the commission of the offense of first degree murder.

¶ 33    Arsenio was sentenced to consecutive terms of 33 years for the first degree murder conviction, plus 15 years for the statutory firearm enhancement, and 15 years for his aggravated battery with a firearms conviction. Codefendant Hill was sentenced to a term of 28 years for the first degree murder conviction, plus 15 years for the statutory firearm enhancement, and 10 years for his aggravated battery with a firearms conviction. The court denied Arsenio's motion to reduce his sentence.

¶ 34    Arsenio Willis timely appealed.

¶ 35                                    ANALYSIS

¶ 36    We will first address the constitutional arguments Arsenio raises concerning the automatic transfer provision of the Juvenile Court Act. Second, we will address his arguments regarding the effectiveness of his trial counsel as it relates to *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny. Finally, we will address the remainder of his arguments, including the sufficiency of the evidence, the propriety of the State's closing arguments, and the constitutionality of his sentence.

¶ 37                Automatic Transfer Provision of the Juvenile Court Act

¶ 38    Arsenio challenges the constitutionality of the automatic transfer provision of the Illinois Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)), which statutorily excludes 15- and 16-year-olds charged with certain crimes from the jurisdiction of the juvenile court. Arsenio argues the automatic transfer provision violates federal and state due process, the eight amendment's prohibition against cruel and unusual punishment, and the proportionality clause of the Illinois Constitution. Arsenio also claims the statute is unconstitutional as applied.

¶ 39    Ever since the Illinois legislature enacted "An Act to regulate the treatment and control of dependent, neglected and delinquent children" (1899 Ill. Laws 131)–or the Illinois Juvenile Court Act–on July 1, 1899, Illinois has been a national leader in the field of juvenile justice. The first juvenile court in the country was located in Chicago across the street from Hull House, an effective and prominent social service agency founded by social reformer Jane Addams. It was Addams who rallied the movement for a separate juvenile justice system, which would remove children from being tried and imprisoned by the adult criminal system. During the intervening decades, however, the pendulum has swung back and forth on the legal system's handling of juvenile offenders as adults.

¶ 40    One fundamental shift that has occurred nationwide, and in Illinois since the 1980s, is the proliferation of juvenile transfer laws increasing the number and variety of offenses eligible for transfer to criminal courts while lowering age restrictions. Of the three primary methods of transfer, judicial waiver (case filed in juvenile court and evidentiary hearing based on articulated standards), prosecutorial discretion (case filed in either juvenile or

criminal court without hearing), and statutory exclusion (case by operation of law heard by criminal court), section 5-130 of the Juvenile Court Act adopts the statutory exclusion method, subjecting juvenile offenders, based on their alleged criminal activity involved, to the adult criminal system and all that entails.

¶ 41    Section 5-130(1)(a) of the Juvenile Court Act provides, "[t]he definition of delinquent minor under Section 5-120 of this Article shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with *** first degree murder." 705 ILCS 405/5-130(1)(a) (West 2010). Under section 5-130(1)(c)(i), the trial court had "available any or all dispositions prescribed for that offense under Chapter V of the Unified Code of Corrections." 705 ILCS 405/5-130(1)(c)(i) (West 2010). Section 5-4.5-20(a) of the Unified Code of Corrections provides that the sentencing range for first degree murder is 20 to 60 years of imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2010). Accordingly, under the automatic transfer provision of section 5-130, once Arsenio was charged with first degree murder, his case proceeded in criminal court, where he was subject to a minimum 20-year prison sentence, without any initial consideration for his age, an analysis of his mental culpability or any other relevant information such as his propensity for rehabilitation.

¶ 42    Arsenio acknowledges that the Illinois Supreme Court has previously decided that the automatic transfer provision at issue here complies with constitutional requirements (see, e.g., *People v. J.S.*, 103 Ill. 2d 395, 405 (1984); *People v. M.A.*, 124 Ill. 2d 135, 147 (1988)), but argues that the court's rationale must be revisited in light of three recent United States Supreme Court cases, *Roper v. Simmons*, 543 U.S. 551 (2005), *Graham v. Florida*, 560 U.S. 48 (2010), and *Miller v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012), as well as the renewed trend to treat juvenile offenders differently than adult offenders. Arsenio argues that based on the precedents of *Roper*, *Graham*, and *Miller*, it is no longer rational to automatically transfer juvenile offenders to adult court without considering their youthfulness and rehabilitative potential.

¶ 43    We review the constitutionality of a statute *de novo*. *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 200 (2009). Our supreme court has instructed us that statutes "are presumed constitutional" and that a party challenging the validity of a statue bears the burden of rebutting that presumption. *People v. Cornelius*, 213 Ill. 2d 178, 189 (2004). "Moreover, ' "it is our duty to construe acts of the legislature so as to uphold their constitutionality and validity if it can reasonably be done, and, further, that if their construction is doubtful, the doubt will be resolved in favor of the validity of the law attacked." [Citations.]' " *Davis v. Brown*, 221 Ill. 2d 435, 442 (2006) (quoting *People v. Inghram*, 118 Ill. 2d 140, 146 (1987)).

¶ 44    Although *Roper*, *Graham*, and *Miller* address constitutional challenges to sentencing statutes, we agree their analysis bears consideration when discussing the constitutionality of an automatic transfer provision. In *Roper*, the 17-year-old defendant was tried and convicted as an adult for murder; he was sentenced to death under Missouri law. The United States Supreme Court held the eighth and fourteenth amendments prohibit the execution of juvenile defendants who were under the age of 18 at the time of the commission of their crime. *Roper*, 543 U.S. at 578. The Court identified "[t]hree general differences between juveniles under 18 and adults [which] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Roper*, 543 U.S. at 569. The first distinction was a lack of

maturity and an "underdeveloped sense of responsibility" among youth. (Internal quotation marks omitted.) *Roper*, 543 U.S. at 569. The second, that juveniles are more easily influenced by outside pressure, particularly peer pressure. Lastly, that the character of a juvenile offender has not been fully formed yet, meaning his or her personality traits are still susceptible to change. *Roper*, 543 U.S. at 569-70. The Court reasoned "[t]he susceptibility of juveniles to immature and irresponsible behavior means 'their irresponsible conduct is not as morally reprehensible as that of an adult.' " *Roper*, 543 U.S. at 570 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988)).

¶ 45    In *Graham*, the 16-year-old defendant participated in an attempted robbery. Under Florida's transfer provision, at the discretion of the prosecutor, he was charged as an adult. He pled guilty to armed burglary with assault and battery and attempted armed robbery. Initially, he was sentenced to concurrent three-year terms of probation, but when he violated his probation by committing a home-invasion robbery, possessing a firearm, associating with others engaged in criminal activity, and resisting arrest, his probation was revoked and he was sentenced to life in prison without parole. *Graham*, 560 U.S. at 53-57. The Supreme Court ruled it is unconstitutional to impose a life sentence without parole for a juvenile who did not commit a homicide in light of the goal of rehabilitation. *Graham*, 560 U.S. at 74. The Supreme Court held that "[b]y denying the defendant the right to reenter the community, the State makes an irrevocable judgment about that person's value and place in society. This judgment is not appropriate in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Graham*, 560 U.S. at 74. The Court made clear, however, "[t]he Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." *Graham*, 560 U.S. at 75.

¶ 46    The *Miller* decision, like *Roper* and *Graham*, was decided on a constitutional challenge to a sentencing statute. State law mandated that the two 14-year-old offenders, who were convicted of murder, be sentenced to life in prison without the possibility of parole, even if the judge or jury would have thought that the defendants' youth and other individual characteristics, along with the nature of the crime, made a lesser sentence more appropriate. *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. The United States Supreme Court held that mandatory life imprisonment without parole for juvenile offenders, those under 18 years of age at the time of their crime, violates the eight amendment's prohibition against cruel and unusual punishment because it "runs afoul of our cases' requirement of individualized sentencing for defendants facing the most serious penalties." *Miller*, 567 U.S. at ___, 132 S. Ct. at 2460. In holding as it did, the Supreme Court found the sentencing scheme troubling because it prevented the sentencing court from considering the "juvenile's 'lessened culpability' and greater 'capacity for change.' " *Miller*, 567 U.S. ___, 132 S. Ct. at 2460 (quoting *Graham*, 560 U.S. at 68, 74).

¶ 47    Despite the growing trend to treat juvenile offenders differently than adult offenders, this court, in both *People v. Salas*, 2011 IL App (1st) 091880, and *People v. Jackson*, 2012 IL App (1st) 100398, addressed, and rejected, the constitutional arguments Arsenio now raises against the automatic transfer provision of the Juvenile Court Act. Arsenio argues that *Salas*

and *Jackson* were wrongly decided. In *People v. Salas*, the court held that the automatic transfer provision of the Juvenile Court Act did not deprive a defendant of his or her due process rights. *People v. Salas*, 2011 IL App (1st) 091880. Likewise, in *People v. Jackson*, we analyzed a defendant's substantive and procedural due process arguments to determine whether the automatic transfer provision violated the constitutional guarantee that a person may not be deprived of liberty without due process of law or whether the procedural mechanisms employed in the statute require that the defendant be given the opportunity to be heard in both a meaningful time and manner. *Jackson*, 2012 IL App (1st) 100398, ¶ 13. Doing so, the court held, "*People v. J.S.* remains on solid footing with the Supreme Court's holdings in *Roper* and *Graham*." *Jackson*, 2012 IL App (1st) 100398, ¶ 16.

¶ 48     Similar to the defendant in *Jackson*, Arsenio argues that automatic transfer of 15- and 16-year-old offenders to adult court without a hearing to address whether the legitimate penological justifications for adult sentencing practices apply to the juvenile offenders is a violation of his procedural and substantive due process rights. See *Jackson*, 2012 IL App (1st) 100398, ¶ 17. In *Jackson*, the defendant's argument was deemed without merit, our supreme court having considered the due process argument as it applied to the automatic transfer provision of the Juvenile Court Act in *People v. J.S. Id.*; see also *People v. Salas*, 2011 IL App (1st) 091880, ¶¶ 76-80 (rejecting due process challenges to automatic transfer statute, finding *Roper* and *Graham* were inapplicable and *J.S.* remains binding).

¶ 49     Arsenio further argues the automatic transfer provision violates the eight amendment's prohibition against cruel and unusual punishment because it requires that all 15- and 16-year-olds who are charged with certain crimes be transferred to adult criminal court without consideration of their adolescence. The eighth amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII. Arsenio argues that *Roper* and *Graham* require reconsideration of automatic transfer provisions and that none of the legitimate penological goals of retribution, deterrence, incapacitation, and rehabilitation are met by automatically transferring 15- and 16-year-old juveniles to adult criminal court.

¶ 50     While this court has already addressed whether the automatic transfer provision constitutes cruel and unusual punishment and determined it does not (*Salas*, 2011 IL App (1st) 091880, ¶ 66; *Jackson*, 2012 IL App (1st) 100398, ¶ 17), Arsenio argues the automatic transfer provision of the Juvenile Court Act violates the proportionality clause of the Illinois Constitution. In *Salas*, this court held that it does not; a holding reconfirmed in *Jackson*. *Jackson*, 2012 IL App (1st) 100398, ¶ 19. The proportionate penalties clause states that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. The clause specifically addresses penalties. In *Salas* and *Jackson*, the court found the defendants challenged the procedure, *i.e.*, the automatic transfer provision, that exposed them to the range of possible penalties for adults in criminal court, not the penalty, and held the automatic transfer provision imposes no actual penalty. Accordingly, in *Salas* and *Jackson*, this court held that because the automatic transfer provision of the Juvenile Court Act imposes no penalty or punishment, the proportionality clause of the Illinois Constitution is inapplicable.

¶ 51    Lastly, Arsenio raises an as–applied challenge to the automatic transfer provision. Arsenio failed to raise this challenge in the trial court and, therefore, we will not adjudicate his claim here. See *In re Parentage of John M.*, 212 Ill. 2d 253, 268 (2004) ("A court is not capable of making an 'as applied' determination of unconstitutionality when there has been no evidentiary hearing and no findings of fact." (citing *Reno v. Flores*, 507 U.S. 292, 300-01 (1993))). Instead, we focus solely on his facial constitutional challenges to the provision.

¶ 52    This court has consistently rejected the constitutional arguments Arsenio makes against the automatic transfer provision of the Juvenile Court Act and, instead, chosen to follow the analysis of *Salas* and *Jackson*. See *People v. Falconer*, 2013 IL App (1st) 112809-U; see also *People v. Pacheco*, 2013 IL App (4th) 110409; *People v. Jenkins*, 2013 IL App (1st) 103006-U; *People v. Patterson*, 2012 IL App (1st) 101573, *appeal allowed*, No. 115102 (Ill. Jan. 30, 2013); *People v. Croom*, 2012 IL App (4th) 100932; *People v. Sanders*, 2012 IL App (1st) 102040.

¶ 53    Although we see a nationwide trend developing to treat juvenile offenders differently than adult offenders and agree that this trend might some day lead to a realization that a mandatory transfer provision implicates constitutional rights, the current decisions of our state and federal court do not allow us to reach that result at this time. Accordingly, we are upholding the constitutionality of the automatic transfer of 15- and 16-year-old juveniles to adult court under the Juvenile Court Act.

¶ 54    That being said, we recognize the logic of Justice Appleton's recent dissent in *People v. Pacheco*, 2013 IL App (4th) 110409, "[i]t is the blanket transfer based on age that is the flaw in the legislature's response. Such decisions are better made on the circumstances of the offender as well as the offense. In that sense, we should look to both the crime and the nature of the criminal." (Emphasis omitted.) *Pacheco*, 2013 IL App (4th) 110409, ¶ 99 (Appleton, J., dissenting). Further, we find the discussion in Jennifer Park's Note, *Balancing Rehabilitation and Punishment: A Legislative Solution for Unconstitutional Juvenile Waiver Policies*, to be an adapt recitation of the issues. Although ahead of the current case law, Ms. Park proposes a two-part solution to remedy the constitutional and procedural concerns associated with waiver policies that may be useful in the future as this area develops. See Jennifer Park, Note, *Balancing Rehabilitation and Punishment: A Legislative Solution for Unconstitutional Juvenile Waiver Policies*, 76 Geo. Wash. L. Rev. 786 (2008).

¶ 55    While the constitutional underpinnings necessary to reverse the automatic transfer provision would be a stretch at the current time, the law in this area continues evolving, as well it should. The decision of whether to try a minor as an adult has costly and lifelong consequences for the juvenile and for society as a whole.

¶ 56    The right for a child to be treated as one is a basic tenet of a just society. Yet, this tenet comes under particular stress when a society balances the needs of its children against its role of preventing and punishing crime and protecting citizens. How a society deals with this difficult balance reflects mightily on its values. It is a balance that our society must try to get right. And we must try in a culture in which violence has become far more commonplace, in a nation in which the federal, state, and local governments have neither the resources nor ability to adequately address the underlying social factors that precipitate violence, and in a

society in which juveniles regularly witness adults solving problems in violent ways.

¶ 57    Since 2005, the United States Supreme Court has relied on the research of adolescent development to rule that youth are fundamentally different from adults and, therefore, must be treated differently under the law. Between 2005 and 2012, the Supreme Court issued four opinions addressing the principle that juvenile offenders are different from adults and, therefore, should be treated differently. See *Miller*, 567 U.S. ___, 132 S. Ct. 2455; *J.D.B. v. North Carolina*, 564 U.S. ___, 131 S. Ct. 2394 (2011); *Graham*, 560 U.S. 48; *Roper*, 543 U.S. 551. By so doing, the Supreme Court has acknowledged that offense severity does not automatically turn a child into an adult and that immaturity is relevant in assessing culpability. But, the discussion has centered around sentencing statutes, not automatic transfer provisions. While we agree that *Roper*, *Graham*, and *Miller* have provided juvenile offenders with more constitutional protections than adult offenders, we cannot accept the expansive reading defendant asks us to make, that is, to declare the automatic transfer provision unconstitutional. The Illinois supreme court's opinion in *J.S.* remains good law, and we may not depart from it.

¶ 58    Arsenio having failed to overcome the strong presumption of constitutionality, we reject the constitutional challenge to the automatic transfer provision of the Juvenile Court Act.

¶ 59                                      *Krankel*

¶ 60    Arsenio asks us to remand his case because the trial court failed to question him or his defense counsel about the basis of the ineffective assistance of counsel claims or trial counsel's unusual withdrawal of them and, thus, failed to conduct an adequate *Krankel* inquiry.

¶ 61    The State maintains *Krankel* is inapplicable where defendant's trial counsel was retained and not appointed and defendant never accused counsel of being ineffective or expressed dissatisfaction with counsel's representation to the trial court. The State further contends that without any solid basis supporting an allegation of ineffective assistance of counsel, the trial court was under no obligation under *Krankel* to make a *sua sponte* inquiry regarding the effectiveness of Arsenio's retained counsel.

¶ 62    After the jury returned a guilty verdict, but before sentencing, defense counsel filed a motion for a new trial alleging, *inter alia*, that he provided ineffective assistance of counsel by failing "to use due diligence to insure Frederick Williams would be available to testify at trial." In the motion, defense counsel stated that Frederick's live testimony was "material" to defense counsel's trial strategy and that the stipulation offered by the State was insufficient to satisfy this strategy. Defense counsel claimed Arsenio was prejudiced because the jury did not hear Frederick's live testimony. At the hearing, the State noted that counsel's allegation created a conflict of interest. The ASA stated, "I think there might be a conflict here. [Defendant's trial attorney], in paragraph 9, is recusing [*sic*] himself ineffective assistance. I don't know if that's allowable for him to do that in his motion and then argue the motion." The court asked, "Do you want to file a motion disqualifying him, by agreement, June 15?" Defense counsel responded, "For purposes, I'll strike that paragraph." The case was continued. Four months later, the court heard arguments on the motion. At that time, neither

-12-

Arsenio nor his counsel made any allegations of ineffective assistance of counsel. The court made no inquiry into the allegation of ineffective assistance and the issue was not raised again.

¶ 63 Arsenio contends the court's conduct in the face of defense counsel's allegation failed to satisfy the preliminary requirement of *Krankel* and *People v. Moore*, 207 Ill. 2d 68 (2003), and, therefore, asks this court to remand for appointment of counsel and a full inquiry into the allegation of ineffective assistance of counsel. Citing *Moore*, Arsenio points out that the "operative concern for the reviewing court is not whether counsel was ineffective, but rather whether the trial court conducted an adequate inquiry into the allegations of ineffective assistance of counsel. *Moore*, 207 Ill. 2d at 77-81."

¶ 64 In *Krankel*, the defendant presented a *pro se* posttrial motion alleging ineffective assistance of counsel based on counsel's failure to present an alibi defense that the defendant claimed was supported by witnesses the defendant provided. The Illinois Supreme Court held that alternate counsel should have been appointed for the defendant in light of his claim. The court remanded the matter for a new hearing on the defendant's motion with newly appointed counsel. *Krankel*, 102 Ill. 2d at 187-89. Providing further guidance of the procedures to be followed by a trial court under *Krankel*, the Illinois Supreme Court determined that appointment of new counsel is not automatically required whenever a defendant presents a *pro se* posttrial motion alleging ineffective assistance of counsel. See *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Rather, the trial court must conduct a preliminary inquiry into the factual basis of the defendant's claim, and if it finds the claim lacks merit or relates only to matters of trial strategy, the court may deny the defendant's *pro se* motion without appointing new counsel. *Moore*, 207 Ill. 2d at 77-78. If, however, the defendant's allegations show "possible neglect" of the case, new counsel should be appointed. *Moore*, 207 Ill. 2d at 78. In reviewing the posttrial proceedings on the defendant's *pro se* motion, our primary objective is to determine "whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Moore*, 207 Ill. 2d at 78.

¶ 65 That State relies on our supreme court's decision in *People v. Pecoraro*, 144 Ill. 2d 1, 15 (1991), to argue that Arsenio, because he had privately retained counsel, was not entitled to a *Krankel* inquiry. In *Pecoraro*, the Illinois Supreme Court held that "*Krankel* is a fairly fact-specific case, and the circumstances in the case at hand, where defendant retained his own private counsel and did not request that he be represented by other counsel, do not warrant the application of *Krankel*." *Pecoraro*, 144 Ill. 2d at 15. The court reasoned that unlike in *Krankel*, where the defendant was represented by an appointed public defender, defendant Pecoraro had retained private counsel to represent him at trial and in posttrial motions and, therefore, "[i]t was not within the trial court's rubric of authority to advise or exercise any influence or control over the selection of counsel by defendant, who was able to, and did, choose counsel on his own accord." *Pecoraro*, 144 Ill. 2d at 15.

¶ 66 We note, however, that in interpreting *Pecoraro*, this court has reached contradictory conclusions regarding whether a defendant represented by privately retained counsel is entitled to a *Krankel* inquiry. In *People v. Shaw*, 351 Ill. App. 3d 1087, 1092 (4th Dist. 2004), the appellate court noted that the defendant, "as in *Pecoraro*," was represented by private counsel and held that a *Krankel* inquiry was not required. In *People v. Johnson*, 227

Ill. App. 3d 800, 810 (1st Dist. 1992), on the other hand, this court stated: "we do not believe *Pecoraro* stands for the proposition that a trial court is free to automatically deny a *pro se* request for new counsel simply because the defense counsel who was allegedly ineffective was privately retained."

¶ 67 The State argues that even if we follow the decision in *Johnson*, and find that *Krankel* applies even where counsel was not appointed, Arsenio's claims would still fail because Arsenio never expressed dissatisfaction with his trial counsel's representation. In *People v. Taylor*, 237 Ill. 2d 68, 76-77 (2010), our supreme court held that to be entitled to a *Krankel* hearing, the defendant must have "expressly complained about counsel's performance." The State argues that after defense counsel struck the allegation of ineffective assistance from Arsenio's posttrial motion, there was no allegation of ineffective assistance of counsel pending before the trial court.

¶ 68 Arsenio argues the facts of this case are unique and that none of the cases cited by the State stand for the proposition that an attorney can withdraw a claim of ineffective assistance and "absolve the court of its duty to inquiry under *Krankel*." We agree.

¶ 69 The underlying facts are unusual. First, trial counsel raised the issue of his own ineffectiveness himself, which is unusual, but then, even more unusual, is that counsel changed his mind based on the court's comments and withdrew his allegation. The trial court made no inquiry into the factual matters underlying the ineffective assistance claim. Instead, once the prosecutor pointed out that the posttrial motion alleging trial counsel's ineffectiveness created a conflict of interest, defense counsel was allowed to simply withdraw the allegation without explanation. There also is the matter of the age of the defendant and what that implies.

¶ 70 The State seems to suggest that in order to preserve his ineffective assistance of counsel claim, Arsenio should have raised an objection to trial counsel's withdrawal of the issue or made clear, in some other manner, to the trial court that he was dissatisfied with his trial counsel's representation. Given that Arsenio was a minor at the time of his trial, we cannot reasonably expect him to raise the issue of his trial counsel's ineffective assistance on his own. A juvenile would be expected to be more at the mercy of counsel than an adult, and less likely to be cognizant and aware of his legal rights.

¶ 71 The conflict of interest faced here by defense counsel is exactly the conflict a *Krankel* inquiry attempts to rectify. The basis of the conflict has been recognized by our supreme court,

"An attorney cannot be expected to argue his own ineffectiveness. *** To advance [the defendant's] argument that [his lawyer] had mishandled the trial proceedings would have required the lawyer to argue his own incompetence on appeal. To avoid the criticism that he was incompetent would have required that he compromise his obligation as an attorney to represent [the defendant] zealously. The lawyer thus faced an inherent conflict of interest." *People v. Lawton*, 212 Ill. 2d 285, 296 (2004).

¶ 72 In light of this inherent conflict, the trial court has a duty to conduct an adequate inquiry when allegations of ineffective assistance arise. *Moore*, 207 Ill. 2d at 77-79. The trial court can not simply ignore or fail to address a claim of ineffective assistance of counsel without

-14-

consideration of the claim's merits. See *People v. Sanchez*, 329 Ill. App. 3d 59, 66 (2002) ("The trial court should afford a defendant the opportunity to specify and support his complaints and not 'precipitously and prematurely' deny the motion." (quoting *People v. Robinson*, 157 Ill. 2d 68, 86 (1993))). "During this evaluation, some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Moore*, 207 Ill. 2d at 78. Because the adequacy of the trial court's inquiry into the allegations of ineffective assistance of counsel in light of *Krankel* is a matter of law, our review is *de novo*. *People v. Vargas*, 409 Ill. App. 3d 790, 801 (2011).

¶ 73 Here, the record shows the trial court failed to adequately inquire into Arsenio's allegation of ineffective assistance as raised by his trial counsel in the posttrial motion. The inquiry did not need to be lengthy or arduous; a brief discussion between the trial court and Arsenio concerning trial counsel's alleged ineffective assistance and counsel's later decision to strike the claim from the posttrial motion would have been sufficient to satisfy the court's burden under *Krankel*. See *Moore*, 207 Ill. 2d at 79. The trial court failed to look into the allegation at all and by neglecting to do so, failed to determine whether the alleged error of trial counsel showed possible neglect of defendant's case such that appointment of additional counsel was necessary. An inquiry was required here. Because the trial court did not conduct any inquiry into Arsenio's claims of ineffective assistance of trial counsel, the court failed to satisfy the requirements of *Krankel* and its progeny.

¶ 74 When the defendant's claims of ineffective assistance of counsel are based on matters outside the record, as they are here, and the trial court failed to conduct an adequate *Krankel* inquiry, the proper remedy is to remand the matter to the trial court for the limited purpose of allowing the trial court to conduct the required inquiry. *Vargas*, 409 Ill. App. 3d at 803; see also *People v. Parsons*, 222 Ill. App. 3d 823, 830-31 (1991). The trial court did not inquire into the efforts made by defense counsel to secure the live testimony of Frederick Williams at trial or the importance of his live testimony to the defense strategy. The record reveals nothing concerning defense counsel's efforts or lack thereof. Accordingly, we are unable to evaluate Arsenio's claims of ineffective assistance of counsel, as raised by his trial counsel, because the trial court made no *Krankel* inquiry. We remand the case for the limited purpose of having the court conduct an adequate inquiry into Arsenio's claims of ineffective assistance of counsel in accordance with *Krankel* and its progeny.

¶ 75                                  Sufficiency of the Evidence

¶ 76 Arsenio argues the State failed to prove him guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm because the State did not prove that he shot the victims or that he was accountable for the shooter's conduct. Arsenio argues there was no evidence he fired the shots that struck the victims. He further argues that his conviction based on an accountability theory cannot stand for three reasons. First, he drew his gun and fired after Hill shot Lucas to help Hill escape. Secondly, the State failed to prove Arsenio shared a common design or intent with Hill before or during the shooting. Lastly,

it is impossible to conclude that Arsenio was culpable for the principal's conduct under an accountability theory without proof of who fired the shots that struck the victims.

¶ 77   In reviewing the sufficiency of the evidence to sustain a conviction on appeal, the relevant inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *People v. Thomas*, 178 Ill. 2d 215, 231-32 (1997). Hence, we will not substitute our judgment for that of the trier of fact on the weight to be given the evidence or the credibility of the witnesses. *Thomas*, 178 Ill. 2d at 232. The trier of fact must "resolve conflicts in the testimony, *** weigh the evidence, and *** draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. The standard in *Jackson* applies when reviewing a finding that a defendant was guilty through an accountability theory. *People v. Williams*, 193 Ill. 2d 306, 338 (2000).

¶ 78   An individual commits the offense of first degree murder when he or she intends to kill or do great bodily harm and knows that his or her acts will cause death, or knows that the acts create a strong probability of death or great bodily harm. 720 ILCS 5/9-1(a)(1), (2) (West 2010). A person commits the crime of aggravated battery with a firearm when he or she knowingly or intentionally causes an injury to another person by discharging a firearm. 720 ILCS 5/12-4.2(a)(1) (West 2010). Under section 5-2(c) of the Criminal Code of 1961, Illinois's accountability statute (720 ILCS 5/5-2(c) (West 2010)), a person is legally accountable for the conduct of another when,

> "either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he or she solicits, aids, abets, agrees, or attempts to aid that other person in the planning or commission of the offense."

¶ 79   To prove the defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design. *In re W.C.*, 167 Ill. 2d 307, 337 (1995). The common design rule holds that where "two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d at 337. Words of agreement are not required to prove a common design or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime. *People v. Batchelor*, 171 Ill. 2d 367, 376 (1996). In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene. *People v. Taylor*, 164 Ill. 2d 131, 141 (1995). "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute

-16-

circumstantial evidence which may tend to prove and establish a defendant's guilt." *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990). As a reviewing court, we will not set aside a trier of fact's finding that a defendant is legally accountable for the criminal act of another, unless the evidence, when viewed in the light most favorable to the prosecution, is "so improbable or unsatisfactory" that a reasonable doubt of the defendant's guilt exists. *People v. Cooks*, 253 Ill. App. 3d 184, 189 (1993).

¶ 80  Arsenio contends he limited his participation to assisting Hill escape from the scene of a completed crime. Arsenio relies on *People v. Dennis*, 181 Ill. 2d 87 (1998), to argue that spontaneously firing a handgun to cover an escape after a murder has already been completed is insufficient to establish accountability for the murder. In *Dennis*, the Illinois Supreme Court reviewed the trial court's answer to a jury question. During deliberations, the jury asked the court, " 'When is the commission of the offense [of armed robbery] completed?' " and " 'When is the commission of the crime over?' " *Dennis*, 181 Ill. 2d at 92. The court responded, " 'you may consider the period of time and the activities involved in escaping to a place of safety.' " *Dennis*, 181 Ill. 2d at 92. The Illinois Supreme Court found the trial court's instruction was "misleading and tantamount to a directed verdict of guilty," holding that the instruction the court provided "was a statement of the felony-murder escape rule," which was "not applicable for accountability purposes" because escape is not an element of the offense of armed robbery. *Dennis*, 181 Ill. 2d at 93, 107, 110. In doing so, the supreme court said it was applying a harmless error standard, not the standard of *Jackson v. Virginia*, 443 U.S. 307 (1979), due to the issue being claimed instructional error, not sufficiency of the evidence. *Dennis*, 181 Ill. 2d at 95. The issue before us is the sufficiency of the evidence; and thus, Arsenio's reliance on *Dennis* is misplaced.

¶ 81  Arsenio argues the most factually similar precedents are *People v. Estrada*, 243 Ill. App. 3d 177 (1993), and *People v. Taylor*, 186 Ill. 2d 439 (1999). Both *Estrada* and *Taylor* reversed convictions based on a finding that the defendant was accountable for the shooter's conduct.

¶ 82  The State argues *Estrada* is distinguishable on the facts, pointing out that both Arsenio and Hill were shooting toward the victims at various times during the incident. Arsenio argues this factual difference does not warrant a different outcome from the *Estrada* case. Although there was only one shooter in *Estrada*, the defendant chased the victim with a tire iron and smashed a window after the victim had been shot, evidence Arsenio argues is much stronger than the evidence here. *Estrada*, 243 Ill. App. 3d at 179.

¶ 83  In *Taylor*, the defendant was driving with a friend, whom the defendant knew was carrying a gun, when the defendant and the victim were involved in a traffic accident. *Taylor*, 186 Ill. 2d at 442-43. After the accident, the victim got out of his car and began verbally harassing the defendant's friend. *Taylor*, 186 Ill. 2d at 443. The defendant's friend responded by getting out of the defendant's car and firing his gun at the victim. *Taylor*, 186 Ill. 2d at 443. The Illinois Supreme Court reversed the defendant's conviction because the State presented no evidence the defendant knew his friend intended to fire the gun. The court held that the accident, which set the chain of events into motion and led to the shooting, was "unforeseeable" and "spontaneous." *Taylor*, 186 Ill. 2d at 448.

¶ 84    The State distinguishes *Estrada* and *Taylor*, noting that Arsenio brought a gun to the scene of the shootings. He joined Hill in shooting at Lucas and continued to shoot at the other people in the backyard.

¶ 85    We agree with the State that because of Arsenio's actions, unlike the defendants in *Estrada* and *Taylor*, he was not convicted based on his "mere presence" at the scene but, rather, based on eyewitness testimony that he and Hill both shot at Lucas and the other individuals in the backyard.

¶ 86    Arsenio argues the State offered no evidence that he knew Hill was going to open fire in the backyard or that he even knew Hill had a gun on him when they arrived at the dice game. The State contends that when the evidence is viewed in the light most favorable to the prosecution, the evidence establishes not only that Arsenio shared the criminal intent of Hill, but also that there was a common criminal design.

¶ 87    Multiple witnesses saw Arsenio and Hill arrive together and testified that both were armed when they arrived. McCollum and Burrows testified that Hill inserted himself into the conversation between Lucas and Williams about the money Williams owed Lucas, and that Hill pulled out a gun. McCollum further testified that Hill fired as he pointed the gun at Lucas, and as Lucas struggled to get the gun away from Hill, another shot was fired, although McCollum could not tell who fired that shot. McCollum testified he saw Arsenio leave the stairs from which he had been sitting and begin firing at Lucas, who was on the ground. And, McCollum saw both Arsenio and Hill run from the scene.

¶ 88    Burrows testified that he saw Hill's gun go off while it was pointed at Lucas's legs. He further testified that as he was attempting "to get out of the way," he saw Arsenio shooting at the people in the backyard as Hill was fleeing the yard. Burrows, who took a shot in his side, testified he knew Arsenio shot him because Arsenio, and no one else, was shooting in the backyard at the time. And, Burrows testified the only guns at the scene that he saw were Arsenio's and Hill's.

¶ 89    The testimony of McCollum and Burrows provided the jury with a sufficient basis from which reasonable inferences could be drawn that Arsenio attempted to aid Hill while he was shooting at Lucas. Accordingly, the jury's finding that Arsenio was legally responsible for the death of Lucas and Burrows's injuries is not so "improbable or unsatisfactory" that a reasonable doubt of the defendant's guilt exists. See *Cooks*, 253 Ill. App. 3d at 189.

¶ 90    Lastly, on this issue, Arsenio argues the State failed to prove causation because it did not prove the identity of the individual who actually shot the victims.

¶ 91    The Illinois Supreme Court has specifically stated that "a defendant may be found guilty under an accountability theory even though the identity of the principal is unknown." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000). In *Cooks*, the appellate court upheld a defendant's murder conviction even though the shooter was unidentified, reasoning that "the 'common-design rule' is applicable where defendant 'set in motion' the series of events which eventually culminated in [the victim's] death." *Cooks*, 253 Ill. App. 3d at 190.

¶ 92    No evidence established whether the bullets from Arsenio's gun or Hill's gun killed Lucas and injured Burrows. Regardless, McCollum testified he saw Arsenio fire at Lucas on the ground. Likewise, Burrows testified he saw Arsenio shoot at people in the backyard as

Hill and Lucas were fighting on the ground, and as Hill fled from the yard. Burrows further testified he believed Arsenio shot him because no one other than Arsenio was shooting at the time.

¶ 93    In *Batchelor*, our supreme court rejected the same argument Arsenio raises–that the State failed to show defendant could be accountable for the shooter's actions where "his participation was limited to assisting [codefendant's] escape from the scene of a completed offense." *Batchelor*, 171 Ill. 2d at 375. The supreme court noted the trial judge could, and did, find that a common criminal purpose existed during the commission of the offenses between the codefendants because the defendant was "mindful of what was going on before and during the time it was happening, and that he was there to help." *Batchelor*, 171 Ill. 2d at 378.

¶ 94    We agree with the State that the trial evidence supports the jury's finding that a common criminal purpose existed between Arsenio and Hill during the commission of the offenses such that Arsenio could be found accountable for Hill's actions. Multiple witnesses testified Arsenio and Hill arrived together and both of them carried guns. McCollum testified Hill fired at Lucas, and so did Arsenio, as Lucas and Hill were fighting. Burrows testified that as he was attempting "to get out of the way," he saw Hill fleeing and Arsenio shooting at people in the backyard. Burrows said he knew Arsenio shot him because Arsenio was the only person shooting in the backyard at that time, and Arsenio and Hill were the only individuals with guns he saw at the scene.

¶ 95    Moreover, regardless of her inability to remember at trial "what exactly happened at what particular time," Shelia Williams's grand jury testimony and statement to the police, state that she saw Arsenio shooting his gun into the backyard.

¶ 96    Based on the evidence, when viewed in the light most favorable to the State, we hold a rational trier of fact could find Arsenio accountable for the first degree murder of Romaz Lucas and the aggravated battery with a firearm (accountability) of Charles Barrows. Therefore, we reject Arsenio's challenge to the sufficiency of the evidence.

¶ 97                                Closing Arguments

¶ 98    Next, Arsenio contends the prosecutor made improper remarks during closing arguments by misrepresenting the level of proof required to find him accountable, disparaging defense counsel, and misrepresenting the evidence, all of which denied him his due process rights to a fair trial.

¶ 99    The State responds that defendant forfeited this argument by raising it for the first time on appeal. See *People v. Enoch*, 122 Ill. 2d 176 (1988) (to preserve issue on appeal, objection must be made at trial and issue raised in posttrial motion). Additionally, the State argues Arsenio cannot satisfy his burden under the plain error doctrine because the evidence was not closely balanced and no error occurred. The State also contends its closing arguments were properly based on the evidence and reasonable inferences drawn from the evidence. The State maintains it neither misstated the evidence nor shifted the burden of proof, but properly responded to defendant's arguments and commented on and attacked defendant's theory of the case.

¶ 100    As the State observes, Arsenio waived this issue for review by failing to make a timely objection to the portions of the State's argument he now challenges. Arsenio admits he failed to object to the State's arguments at trial or to include them in his posttrial motion, but contends that this issue should be decided under a plain error analysis. We note that the rule of waiver is a limitation on the parties, not the court. See *People v. Williams*, 188 Ill. 2d 293, 301 (1999). Because Arsenio's claim of error rests on his right to a fair trial, we will not apply the waiver rule; instead, we will address his claims on the merits. We first address whether any reversible error has occurred. If there is reversible error, we then will consider whether the error is sufficiently grave to be plain error as Arsenio contends.

¶ 101    Generally, the prosecution has wide latitude in making its closing argument. *People v. Nicholas*, 218 Ill. 2d 104, 121 (2005); *People v. Blue*, 189 Ill. 2d 99, 127 (2000). During closing arguments, the prosecutor may comment on the evidence and any "fair, reasonable inferences" from it, even if those inferences reflect negatively on the defendant. *Nicholas*, 218 Ill. 2d at 121. In doing so, however, the prosecution must make sure the closing argument serves a purpose other than merely "inflaming the emotions of the jury." *Nicholas*, 218 Ill. 2d at 121; *People v. Tiller*, 94 Ill. 2d 303, 321 (1982).

¶ 102    We will not interfere with the trial court's determination of the propriety of the prosecution's closing argument absent a clear abuse of discretion resulting in manifest prejudice to the defendant. *People v. Cisewski*, 118 Ill. 2d 163, 175 (1987). A "prosecutor's comments in closing argument will result in reversible error only when they engender 'substantial prejudice' against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998). In reviewing allegations of prosecutorial misconduct during closing argument, the remarks must be considered in light of the entire arguments of both the prosecution and the defense. *People v. Wheeler*, 226 Ill. 2d 92, 122 (2007). And, a prosecutor may respond to comments made by defense counsel which invite a response. *People v. Hudson*, 157 Ill. 2d 401, 441 (1993).

¶ 103    Arsenio argues the State's arguments "improperly misrepresented the level of proof required to find [defendant] accountable." Arsenio's complaint stems from the State's summation and rebuttal in which the State explained the jury instruction regarding "aids in the commission of the offense." The State argued:

> "Now what does [this instruction] mean, and how does that relate to the first proposition of first degree murder? That means that after the Defendant Hill initially pulled out the gun and fired at Romaz Lucas, as soon as that guy pulled out his gun to help his friend, David Hill was tussling on the ground with Romaz, he aided Mr. Hill. He aided Defendant Hill.
>
> So this instruction doesn't say that they had to have a plan in advance. Absolutely not. It says that during the commission of the offense, if he does, in fact, do anything to aid him, he is legally responsible for his actions."

¶ 104    Arsenio contends the State improperly argued that when Arsenio pulled out his gun to help Hill, he "aided him," within the meaning of the accountability statute, "even if they did not have an advance plan." Arsenio argues the State's arguments were legally incorrect

because the State "had the burden of proving that [defendant] had advance knowledge of the criminal scheme."

¶ 105    We find the State correctly stated the law of accountability. See *Williams*, 193 Ill. 2d at 338 ("A defendant's intent may be inferred from the nature of [his or her] actions and the circumstances accompanying the criminal conduct."). Moreover, the State's argument was a legitimate response to defense counsel's argument suggesting that accountability could not be established without testimony to the effect that Hill told defendant, "I'm doing a shooting here, pull out your gun and help me get out of here, because I don't want to get shot."

¶ 106    Second, Arsenio argues the State improperly disparaged defense counsel by claiming counsel's argument was based on something other than the evidence. Toward the beginning of its summation, the State argued, "[t]here [are] a lot of attempts to distract you, a lot of attempts to get you to focus on things that aren't there." The State went on to argue that defense counsel was trying "[t]o get you to not pay attention to what did come from that witness stand."

¶ 107    Again, we find this rebuttal argument proper. It responds to defense counsel's argument in his opening statement that the lack of DNA evidence established reasonable doubt:

"Now, what evidence does the State have that my client is guilty of anything? No physical evidence. Nothing. There are no fingerprints, no DNA, no fired evidence, nothing."

During closing argument, defense counsel revisited this theme, stating:

"When I spoke with you on Wednesday, before evidence was presented to you, I told you that the State was not going to [be] able to show you a certain number of things. ***

I also told you that the State would present no physical evidence that tied Mr. Arsenio to any of the crimes as charged, and again I think I told you the truth.

* * *

This case is not just stained with reasonable doubt, this case was dipped in a bucket full of reasonable doubt, and it's completely covered and dripping with reasonable doubt."

¶ 108    The State responded:

"And right after he talked about his opening statements, [defense counsel] talked about a bucket of something. Well, you just got a bucket of something, and it ain't reasonable doubt.

There is no reasonable doubt in this case, folks. There [are] a lot of attempts to distract you, a lot of attempts to get you to focus on things that aren't here.

That's not what the law says you are to do. You are to follow the evidence that came from the witness stand, not things that they wish were here, not things that are attempts to distract you from what is here.

In his opening statement, [defense counsel], who is an experienced attorney, who knows what goes on in the courtroom, talked to you about DNA. *** He said there would be no DNA to link this Defendant to the crime, absolutely.

There is no DNA to link this Defendant to the crime. You know why? Because it's not a sex case. There's no bodily fluid left behind by the Defendant at the crime scene, but because DNA is a buzz word, and you folks are jurors, and you are not really experienced in what goes on in the Criminal Court Building, you are being told to look for DNA where there isn't going to be any.

Why? Why are you being told to look for DNA when he knows there isn't going to be any, when it isn't a DNA case? To get you to not pay attention to what did come from that witness stand, the testimony of the witnesses ***."

¶ 109   Arsenio argues that along the same lines, the State attempted to disparage defense counsel's arguments and garner support for Rose Elam, who changed her testimony on the stand. The State argued:

"Rosie [Elam] was pretty easy to confuse ***. And she made a mistake or two on the witness stand. Let's go beat her up or something, because nobody ever makes mistakes in courtrooms, right?"

Arsenio argues defense counsel pointed out the inconsistencies in Elam's testimony in a brief and neutral way and that the State's classification of defense counsel's argument as "beating her up" was improper.

¶ 110   While the prosecution may not accuse defense counsel of attempting to create reasonable doubt by confusion, misrepresentation, or deception (*People v. Love*, 377 Ill. App. 3d 306, 314 (2007)), the prosecution may fairly comment on defense counsel's characterizations of the evidence and may respond in rebuttal to statements of defense counsel that noticeably invite a response (*People v. Evans*, 209 Ill. 2d 194, 225 (2004)). When we view the allegedly disparaging statements of the prosecution within the context of both parties' entire argument, we find the prosecutor's remarks legitimately respond to defense counsel's closing argument.

¶ 111   Arsenio also contends the State's rebuttal argument improperly establishes a "theme" that there is "less protection to accused residents of the Chicago West Side" and that "some diminished standard should be applied based on the neighborhood where the offense occurred." The examples Arsenio cites are taken out of context and, thus, mischaracterized.

¶ 112   Our review of the complained of comments within the entire context of both parties' arguments show the State responding to defense counsel's closing argument which inferred that the State should have presented more individuals from the backyard as witnesses. The State did not improperly argue that the defense was required to subpoena the witnesses and present them at trial, instead, the State properly responded to the defense argument that it failed to subpoena important witnesses. The State's line of argument has been considered permissible repeatedly. See *People v. Kliner*, 185 Ill. 2d 81, 154-55 (1998) (in responding to defense argument that prosecution failed to call witnesses, prosecution did not shift burden of proof when noting defendant's ability to call witnesses). See also *People v. Baugh*, 358 Ill. App. 3d 718, 742 (2005) (where defense implied State had access to certain evidence, but failed to use it, State able to respond that defense also had subpoena power).

¶ 113   Lastly, Arsenio argues the State misstated evidence during rebuttal when it stated, "There is nobody out there with a .22 caliber [weapon] ***." Arsenio argues there was evidence at trial that there was "more than two firearms discharged in the backyard that day." The State

argues Arsenio misstates the evidence because no witness testified they saw any weapons other than those possessed by Arsenio and Hill. A review of the State's full argument on this point shows the State acknowledged that a .22 shell was found at the scene. The State argued:

> "This .22 caliber shell casing is like a four leaf clover for the Defense, and it means as much as a four leaf clover. There is nobody out there with a .22 caliber [weapon], but you do know from the way the neighborhood is that, hey, there's been a shooting or two in the area before."

There is nothing excessive about the State's comments.

¶ 114 Arsenio further argues the State improperly substituted its own opinion concerning the physical evidence for that of the expert witnesses by arguing, "Those bullet holes [on Lucas] are too big to have come from a .22."

¶ 115 The medical examiner expressed no opinion regarding the firearm calibers. As we noted, the prosecutor is allowed wide latitude in closing argument and may comment on the evidence presented and any reasonable inferences to be drawn. See *Nicholas*, 218 Ill. 2d at 121. We find these comments to be just that–an invitation to the jury to make a reasonable inference based on the evidence presented.

¶ 116 Arsenio accuses the State of misleading the jury by stating that Rose Elam's testimony "puts a gun in both of their hands." Arsenio argues Elam's actual testimony was that she saw Hill with a gun. The State argues it correctly recounted her testimony because even though Elam may have been confused regarding whether Arsenio or Hill had a gun when they entered the backyard, she testified she saw both in possession of guns that day.

¶ 117 After a through review of the arguments made by both parties, we find no error in the State's comments. The State's argument, read in its entirety, shows that the comments Arsenio complains of were based on the evidence presented and the reasonable inferences drawn from the evidence. Additionally, the State's argument properly responded to Arsenio's arguments and attacked his theory of defense with its theory. The State's argument did not serve to lessen its burden of proof, disparage defense counsel, or misrepresent the evidence. Because we have found the State's comments to be proper, we need not address this issue further. As we have found no reversible error, there can be no plain error.

¶ 118                                    Sentencing

¶ 119 Arsenio maintains the record establishes that he and his codefendant Hill were similarly situated and, therefore, the disparity in their sentences was unconstitutional. Arsenio seeks a reduction in his sentence to conform with Hill's 53-year sentence.

¶ 120 According to Arsenio, the State recognized Arsenio and Hill were similarly situated by concentrating its arguments concerning sentencing on "these two defendants" and "both defendants." The State never argued the defendants should be treated differently based on their backgrounds or level of participation in the offense. The State argued that both defendants should receive a sentence "in excess of 50 years" for murder.

¶ 121 The statutory sentencing range for first degree murder is a term "not less than 20 years

and not more than 60 years." 730 ILCS 5/5-4.5-20(a)(1) (West 2010). Pursuant to section 5-8-1(a)(1)(d)(i), 15 years will be added to the term of imprisonment if the individual committed the offense while armed with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(i) (West 2010). A conviction for aggravated battery with a firearm is a Class X felony with a sentencing range of not less than 6 years and no more than 30 years. 730 ILCS 5/5-4.5-25(a) (West 2010). Arsenio's sentences fell within the middle of the statutorily permissible range–consecutive terms of 33 years for his first degree murder conviction, plus the mandatory 15-year sentence enhancement for committing the offense with a firearm, and 15 years for his aggravated battery with a firearm conviction (accountability).

¶ 122    The trial court has broad discretion in fashioning an appropriate sentence, and as a reviewing court, we will only reverse the trial court's determination when the court has abused that discretion. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). We will not substitute our judgment for that of the trial court merely because we would have balanced the sentencing factors differently. *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010). A sentence that falls within the statutory range is not an abuse of discretion unless it varies greatly from the purpose of the law or is manifestly disproportionate to the nature of the offense. *People v. Henderson*, 354 Ill. App. 3d 8, 19 (2004).

¶ 123    In determining a sentence, the trial court must balance the interests of society against the ability of the defendant to be rehabilitated. *People v. Tye*, 323 Ill. App. 3d 872, 890 (2001). In doing so, however, the rehabilitative potential of the defendant is given less weight than the severity of the crime. *Tye*, 323 Ill. App. 3d at 890. The "seriousness of the crime committed is considered the most important factor in fashioning an appropriate sentence." *People v. Cox*, 377 Ill. App. 3d 690, 709 (2007) (citing *Tye*, 323 Ill. App. 3d at 890). The severity of the crime has been considered even more important than the lack of a criminal record by the defendant. *People v. Blackwell*, 325 Ill. App. 3d 354, 361 (2001). Other factors the court must consider in choosing an appropriate sentence are "the defendant's personal history, including his age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education." *People v. Maldonado*, 240 Ill. App. 3d 470, 485-86 (1992). If mitigating evidence is presented to the trial court, we are to presume, absent some indication to the contrary, other than the sentence itself, that the trial court considered it. *People v. Benford*, 349 Ill. App. 3d 721, 735 (2004).

¶ 124    Arsenio argues his sentence is unconstitutionally excessive in light of the mitigating factors. Arsenio was only 16 years old at the time of the offense, was attending high school, and had no history of violence. He had been diagnosed with "Attention Deficit Hyperactivity Disorder" (ADHD), had a history of minor drug use, and had only a minimal relationship with his father, who died in 2008.

¶ 125    In sentencing Arsenio, the trial court expressly noted it considered the exact factors Arsenio argues the trial court should consider. Also, the court recognized the seriousness of the crimes as a significant consideration in fashioning the sentences. The sentencing court stated:

    "We are in a situation where two human beings who are 16 years old, have such a total disregard for human life that they go into somebody's backyard and start a gun, not

even a gunfight, nobody else had a gun but [Arsenio] and [Hill.]

And what is baffling to me is that [Arsenio] isn't involved in this. All of a sudden he sees his buddy in trouble, he gets involved, he starts taking out his gun and shooting into a number of people who are in this backyard standing around. It is spraying the crowd, if you will."

The sentencing court expressly considered Arsenio's age, his background, and pre-sentence investigative report before exercising its discretion in sentencing him.

¶ 126    Arsenio also argues his 63-year sentence is unconstitutionally disparate to the 53-year sentence imposed on codefendant Hill.

¶ 127    Generally, an arbitrary and unreasonable disparity between the sentences of codefendants who are similarly situated is impermissible. *People v. Caballero*, 179 Ill. 2d 205, 216 (1997). A disparity in sentences, however, by itself, does not establish a violation of fundamental fairness. *Caballero*, 179 Ill. 2d at 216. A difference in sentences may be justified by the relative character and history of the codefendants, the degree of culpability, rehabilitative potential, or a more serious criminal record. *People v. Martinez*, 372 Ill. App. 3d 750, 759-60 (2007).

¶ 128    The record of the sentencing hearing shows the sentencing court did not find Arsenio and Hill to be similarly situated individuals. Hill presented "medical, psychiatric documents" to the court, showing he had been "in and out of mental [health treatment] homes and group homes since he was eight years old" and that he was a "severely mentally ill young man." Moreover, the trial court found Arsenio's participation in the offense to be "baffling." Based on the trial court's comments during sentencing, Arsenio is unable to show the sentencing disparity was unjustified. Accordingly, we affirm defendant's sentences.

¶ 129                                   CONCLUSION

¶ 130    In light of current precedent, defendant has not met the burden of demonstrating that the mandatory transfer of 15- and 16-year old juveniles to adult court under the Juvenile Court Act is unconstitutional.

¶ 131    Based on the evidence of record, Arsenio was proven guilty beyond a reasonable doubt of first degree murder and aggravated battery with a firearm.

¶ 132    The State's closing arguments were proper. Our examination of the complained of comments, within the context of both parties' arguments, shows no impropriety. The prosecutor's comments did not fall outside the bounds of reasonable argument based on the evidence or the reasonable inferences drawn therefrom, or as invited by defense counsel's argument.

¶ 133    We affirm Arsenio's convictions for first degree murder and aggravated battery with a firearm, as well as his sentences of consecutive terms of 33 years for his first degree murder conviction, plus the 15-year statutory firearm enhancement, and 15 years for his aggravated battery with a firearm conviction (accountability).

¶ 134    We hold the trial court erred by failing to conduct an appropriate preliminary inquiry under *Krankel* to evaluate the posttrial claims of ineffective assistance of trial counsel. We

remand for the limited purpose of conducting a hearing on defendant's claims. We offer no opinion as to whether new counsel should be appointed to undertake an independent review of the claims. The trial court will conduct a preliminary inquiry into the factual basis of the claims to determine if they show possible neglect of the case warranting appointment of counsel. See generally *People v. Ward*, 371 Ill. App. 3d 382, 430 (2007).

¶ 135      Remanded with directions.