NOTICE
Decision filed 08/16/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220073-U

NO. 5-22-0073

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Macon County. |
| | ) | |
| v. | ) | No. 17-CF-1343 |
| | ) | |
| JASON WHITE, | ) | Honorable |
| | ) | Thomas E. Griffith, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BARBERIS delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*:  Cause affirmed where the prosecutor's rebuttal closing argument did not deprive defendant of a fair trial, the circuit court properly instructed the jury following a question during deliberations, and defendant failed to satisfy his burden of showing that the evidence was closely balanced or that plain error occurred in the admission of Matthew Brandt's videotaped statement to police.

¶ 2    Defendant, Jason White, appeals his conviction, following a trial by jury in Macon County, for the offense of first degree murder. On appeal, defendant raises three contentions of error. First, defendant argues that the prosecutor's rebuttal closing argument confused the jury and deprived him of a fair trial. Second, defendant argues that the circuit court committed reversible error where it failed to clarify the law of accountability for the jury. Third, defendant argues that the circuit court erred by allowing the State to publish to the jury portions of Matthew Brandt's videotaped statement to police. For the reasons that follow, we affirm defendant's conviction.

1

¶ 3                    I. Background

¶ 4                    A. The Charges

¶ 5     On September 18, 2017, the State charged defendant by five-count information. Counts I, II, III, and IV charged defendant with the offenses of first degree murder, in violation of sections 9-1(a)(1), (a)(2), and (a)(3) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(1) (West 2016) (count I), 720 ILCS 5/9-1(a)(1) (West 2016) (count II), 720 ILCS 5/9-1(a)(2) (West 2016) (count III), and 720 ILCS 5/9-1(a)(3) (West 2016) (count IV)). All four counts alleged that defendant personally discharged the firearm that proximately caused death to Zachary Hubbart.[1] Count V charged defendant with the offense of armed robbery, in that defendant, while carrying a dangerous weapon, a firearm, knowingly took property, U.S. currency, from Hubbart by the use of force. 720 ILCS 5/18-2(a)(2) (West 2016)). Count V alleged that defendant personally discharged the firearm that proximately caused death to Hubbart.

¶ 6     During a preliminary hearing on October 4, 2017, Detective Timothy Wittmer of the city of Decatur police testified. On August 27, 2017, law enforcement found Hubbart shot to death from multiple gunshot wounds. The owner of the residence, defendant's landlord, indicated that defendant was the last tenant in the home. According to Wittmer, prior to the victim's death, Alex McDaniel and Tanner McGlothlin assisted the victim in negotiating a deal to purchase cannabis from defendant. Cell phone records obtained indicated that both defendant and the victim were present in the vicinity of the crime scene at the time of the murder. Cell phone activity showed communications between the victim's cell phone and defendant's cell phone.

---

[1]The record contains numerous variations in the spelling of the victim's name. For purposes of this order, this court will use "Zachary Hubbart."

¶ 7    Prior to the murder, defendant's cell phone was used to communicate with the cell phone of Ryan Waters. Law enforcement interviewed Bryanta Hart, who stated that on the night of the murder she and Ryan Waters were contacted by defendant by cell phone. Defendant indicated that he wished to pretend that he, Waters, and Hart had cannabis to sell Hubbart. Hart informed law enforcement that when they arrived at the home, the victim, Waters, and defendant walked into the back room of the house. A few minutes later, Hart heard multiple gunshots. Waters ran from the house, entered the vehicle, and advised Hart that defendant shot the victim. Hart advised law enforcement that she assisted in collecting and disposing of evidence at the crime scene on two separate occasions that morning.

¶ 8    Law enforcement interviewed Waters. Defendant advised Waters that he was going to "hit a lick" on the victim. Waters advised law enforcement that they went to the residence and defendant fired a handgun, striking the victim. Waters advised law enforcement that he and Hart helped defendant dispose of evidence from the crime scene.

¶ 9    Autumn Billings, defendant's wife, advised law enforcement that she assisted in concealing evidence from the crime scene by driving it to Lake Decatur, where defendant disposed of items.

¶ 10   The circuit court determined that probable cause existed. The matter proceeded to a jury trial.

¶ 11                                    B. The Trial

¶ 12                                 1. Opening Statements

¶ 13   During opening statements, the State argued that the victim, Hubbart, made money by selling cannabis. Hubbart's supplier was out of town, so Hubbart contacted Alex McDaniel to procure cannabis to sell. Hubbart was ultimately referred to defendant as a supplier. Defendant asked Hubbart to meet him in Decatur, Illinois, in an abandoned house defendant previously

3

rented, in the early morning hours on August 27, 2017. According to the State, Hubbart left his home with approximately $5000.

¶ 14    In the following days, a neighbor, Ray Allen, saw an unfamiliar vehicle parked near the abandoned home. Allen entered the home and observed the victim lying face against a couch, with his body on the floor. Allen observed several gunshot wounds. Allen alerted a friend, Andrew Eubanks, who called police.

¶ 15    Law enforcement investigated the case, which resulted in an interview of Ryan Waters, who went to the home with defendant on the night of the shooting. Bryanta Hart and Matthew Brandt also went to the home with Waters and defendant.

¶ 16    The State argued that Waters and defendant entered the home while Hart and Brandt stayed outside in a vehicle. Waters ran from the home while gunshots continued firing. Then, defendant exited the home. The parties initially left after the shooting, but they went back to the home to pick up shell casings and clean the crime scene. Defendant and Waters disposed of the firearm and other items in Ivy Hill Park by throwing them into a lake.

¶ 17    In defendant's opening statement, defense counsel responded by arguing that the jury would hear from the witnesses themselves and determine that they "may not be all that credible in this case." Defense counsel contended that the evidence would demonstrate that Waters intended to rob Hubbart and that Waters was the one who "pulls the trigger."

¶ 18                                2. The State's Evidence

¶ 19    The State called Linda Hubbart, the victim's mother. On August 26, 2017, the victim advised his mother that he was going on a date. He asked Linda's permission to drive her silver 2012 Camry. Linda was aware that her son dealt cannabis.

4

¶ 20    Ray Allen testified for the State. On August 27, 2017, he and a friend sat at a picnic table near the crime scene. Allen was aware that the nearby home was damaged by fire. He observed a vehicle he had never seen at the home. Allen also noticed that a door to the home remained open "for a day or so." Allen walked over to the home, entered the open door, walked inside, and observed a man "on his knees laying face first on the couch." Allen summoned the friend he was sitting with on the picnic table, Andrew Eubanks. The men called the police.

¶ 21    Officer Todd Cline, a police patrol officer for the City of Decatur, testified for the State. Officer Cline was on call on August 27, 2017. Officer Cline responded to the crime scene following a call from Andrew Eubanks. Officer Cline entered the home and made his way to the living room, where he observed a deceased person. Officer Cline observed what he believed to be gunshot wounds on the victim's body.

¶ 22    Officer Larry Brooks, from the Decatur Police Department, next testified. On August 27, 2017, Officer Brooks responded as a backup officer to Todd Cline at the crime scene. Officer Brooks entered the home and observed a deceased person lying face down on the couch. Officer Brooks transported Allen to the police department for an interview.

¶ 23    Sergeant Christopher Copeland with the Decatur Police Department testified. Sergeant Copeland worked with the public building commissioner to review surveillance footage from a nearby building. Sergeant Copeland obtained surveillance footage which had a view of the home that demonstrated vehicles coming and going from the area of the crime scene.

¶ 24    Sergeant Copeland investigated the Facebook accounts of individuals who may have been involved in the case. Specifically, he identified the victim, Hubbart's, Facebook account. He also identified McDaniel's account. Finally, he identified defendant's account, listed as "Alex Montana." Sergeant Copeland contacted Facebook to preserve the accounts.

¶ 25    Dr. Scott Denton, a forensic pathologist, testified. Dr. Denton performed the autopsy of Hubbart. The parties stipulated that Dr. Denton was an expert witness. Dr. Denton testified that Hubbart had six total gunshot wounds on his body, including on the upper back, the right back, and the lower right back. Dr. Denton removed one bullet from Hubbart's body. Dr. Denton also observed a gunshot wound on the left side of Hubbart's head above and behind the ear. The gunshot caused a basal skull fracture. Dr. Denton observed six total gunshot wounds in the autopsy. Dr. Denton testified that the cause of death was from multiple gunshot wounds.

¶ 26    Alex McDaniel next testified. McDaniel was a friend of Hubbart. McDaniel and Hubbart were at a party together on the night of the shooting. While at the party, McDaniel helped Hubbart get in touch with Tanner McGlothlin in order to "locate marijuana." McDaniel testified that Hubbart ultimately contacted defendant, who wanted to meet in Decatur. McDaniel testified that he offered to accompany Hubbart to Decatur, but ultimately Hubbart did not want McDaniel to attend the meeting with defendant. McDaniel observed Hubbart leave the party in Hubbart's mother's silver vehicle.

¶ 27    Tanner McGlothlin next testified. McGlothlin knew defendant and identified him in court. On the night of the shooting, McGlothlin received a call from McDaniel to arrange a purchase of cannabis. McGlothlin contacted defendant, who indicated that he "would look and he found some" cannabis to sell to Hubbart. McGlothlin exchanged contact information with McDaniel and defendant so they could arrange the transaction. McGlothlin and McDaniel intended to travel to Decatur with Hubbart, but ultimately Hubbart did not want them to go.

¶ 28    Bryanta Hart next testified. Hart testified that she had a criminal history which included two juvenile theft cases. At the time of her testimony, Hart had a pending case for aggravated resisting a peace officer. Hart failed to appear in court in that matter and a warrant issued for her

arrest. In exchange for her testimony in the instant case, the State quashed the warrant. Hart testified that she was not promised anything else in exchange for her testimony in this case.

¶ 29    Hart testified that Ryan Waters was her "son's father." The two lived together. Hart also knew defendant and identified him in the courtroom. On the night of the shooting, Hart was at a local bar with Waters and his friends. Hart received a phone call from defendant. Defendant requested to speak to Waters, and Hart gave Waters her cell phone. Hart and Waters met defendant at "his house on Conduit" with their friend, Matt. Upon getting to the house, Hart observed defendant and the victim sitting in the front seat of a car. Waters and defendant "went around to the back seat" of Hart's van. They then proceeded inside the home with the victim. Hart recalled "hearing a gunshot" then observing Waters running from the home. Hart described Waters as "scared" and "crying." Hart thought that she heard another gunshot as Waters ran from the home.

¶ 30    Hart testified that defendant exited the home and entered the vehicle (van). Waters drove while Hart sat in the passenger seat. Defendant, Waters, Hart, and Matthew Brandt drove to defendant's home to pick up defendant's wife, Autumn. Defendant got into a car with Autumn. The parties went back to the crime scene where defendant and Waters wiped down Hubbart's car. Waters and defendant later "threw something out in the lake" and "started shoving things down in the drain" at the zoo. Hart testified that Waters and defendant removed their shirts and put them in the drain.

¶ 31    Hart testified that she advised law enforcement that Waters was given "half the money." Hart also testified that Waters received a text message from defendant telling Waters to "act like he had some cannabis to sell."

¶ 32    On cross-examination, Hart admitted that she initially lied to law enforcement in this case by telling them that she and Waters were asleep in Boody, Illinois, at the time of these events. Hart

also admitted that she did not initially tell law enforcement that Matthew Brandt was present. Hart testified that she, Waters, and Brandt were intoxicated on the night at dispute. Hart admitted that she "smoke[d] weed" that night as well.

¶ 33    Next, Ryan Waters testified. Waters knew defendant for approximately two months prior to the shooting. Waters testified that he had a criminal history including a conviction for aggravated driving under the influence (DUI) and misdemeanor shoplifting. Waters was also charged with first degree murder and armed robbery for the death of Hubbart. In exchange for Waters' testimony, he would be allowed "to plead guilty to the armed robbery with a cap of 20 years in prison."

¶ 34    On August 26, 2017, Waters went to a bar with Hart, Brandt, and his friend Anthony. Waters received a text message from defendant. Defendant subsequently called Waters and asked Waters meet him. Defendant told Waters to "act like [he] had weed." Waters went to the home with Hart and Brandt. Waters observed defendant and a "white male" sitting in a silver car. When Waters arrived, defendant exited the silver car and went to Waters' car window. Defendant told Waters to "act like [he] had weed in [his] hatch." Waters exited his van and "acted like [he] grabbed weed out of [his] hatch." Waters, defendant, and Hubbart entered the home and went into the front room. Defendant "pulled out a gun and told [Hubbart] to give him everything." Waters testified that he did not have a firearm.

¶ 35    Waters testified that defendant fired the gun, and Waters observed blood on the victim's shirt. Waters ran from the house to his van. While running, Waters heard multiple gunshots. Waters entered the driver's door of the vehicle. Defendant ran out next and entered the van with a black gun. Waters drove from the scene.

¶ 36    Waters drove to Autumn's house, where defendant placed the gun and bullets in a bag. Waters drove to Ivy Hill Park on Lost Bridge Road. Defendant and Waters threw the gun and the bullets into the lake. Waters drove to purchase alcohol and rags. He and defendant removed their shirts and put them down a drainage pipe at the zoo. Waters drove back to the crime scene, where he and defendant wiped down the back door and wiped down the victim's car. The parties left the scene, and defendant gave Waters $1000. Waters went home.

¶ 37    Defendant called Waters and asked him to return to the crime scene to pick up shell casings. Defendant and Waters returned to Autumn's house to put the shell casings in a black trash bag. Defendant asked Waters to throw the bag in the dumpster at the East Side Market, and Waters complied.

¶ 38    On cross-examination, Waters admitted to lying to law enforcement during his initial interview. Waters originally advised law enforcement that he was asleep on the night in question. Waters later contacted police and advised them that he received a message from defendant about "doing a $5,000 cannabis deal."

¶ 39    Next, Matthew Brandt testified. Brandt responded to all of the State's questions by simply responding, "no" or "I don't remember."

¶ 40    Detective Timothy Wittmer from the Decatur Police Department street crimes team testified. Detective Wittmer conducted an interview with Matthew Brandt on November 21, 2017. The video was played for the jury without objection from defense counsel.[2] The video demonstrated that Brandt told Wittmer that he went with Waters and Hart to defendant's house on Conduit Street, and when they arrived, defendant was sitting in the passenger seat of a silver car.

---

[2]The State asked the circuit court to admit the video recorded statement as substantive evidence under section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2020)) as a prior inconsistent statement. Over objection from defense counsel, the court admitted the evidence as substantive evidence, finding the State laid a proper foundation.

According to Brandt, Waters and defendant told the victim to go in the house to wait for them. Five or ten minutes later, Brandt heard gunshots. Waters ran from the home and told Hart and Brandt that defendant "shot him." Defendant ran from the house as well and entered the vehicle, saying that it "went bad." Brandt indicated that Waters received $1000 from defendant. Brandt advised Wittmer that Waters and defendant went back to the house to retrieve "shells" and "wipe[ ] everything down." Brandt indicated that he did not go into the house.

¶ 41    Detective Ronald Borowczyk from the Decatur Police Department next testified. Detective Borowczyk specialized in digital evidence recovery from computers, mobile devices, and other computer type items. Defense counsel stipulated that Detective Borowcyzk was an expert in the area of digital data analysis. Detective Borowczyk examined communications between defendant, Tanner McGlothlin, Alex McDaniel, and Hubbart. Detective Borowczyk discovered a message from defendant to McGlothlin wherein defendant asked McGlothlin to "delete all their communications." Detective Borowczyk further testified that there were communications between McGlothlin and his mother that McGlothlin "felt responsible for turning Mr. Hubbart onto [defendant]."

¶ 42    Detective Scott Cline with the Decatur Police Department next testified. Detective Cline utilized an FBI dive team to recover a firearm, cartridge, and magazine from a lake in Ivy Hill Park.

¶ 43    Hali Carls-Miller, a forensic scientist for the Illinois State Police, testified. Carls-Miller testified that the cartridge casing from the shell casing found at the scene was fired in the firearm recovered from the lake.

¶ 44    Caleb Lassiter next testified. Lassiter testified that he and defendant were "celled together." Lassiter testified that defendant confided in him about the details of the "murder." Lassiter testified

10

that in 2018 he was charged with unlawful possession of a weapon by a felon, which he pled guilty to. He also had a pending felony case for theft, with a prior in 20-CF-201 in Montgomery County. Lassiter pled guilty to the offense and was set for sentencing on December 6, 2021. Lassiter testified that on July 17, 2018, he spoke with Detective Wittmer. Defendant advised Lassiter that it was the night of a UFC fight, and defendant "called the victim over to an abandoned house." Defendant tried to rob the victim, but the victim would not "give it up" so defendant "shot him." Lassiter testified: "He said he shot him once, and he started to go down onto a couch, and then he just kept shooting him." Lassiter testified that he did not know Ryan Waters, Bryanta Hart, or Matthew Brandt.

¶ 45                    3. Defendant's Case

¶ 46    Frankie Ludwig testified for the defense. Ludwig had an extensive criminal history including multiple convictions for driving while license revoked and aggravated DUI. Ludwig participated in "hybrid court" where he met Ryan Waters. Ludwig testified that Waters told him that Waters "pretty much popped the motherfucker." Waters told Ludwig that he was "going to say [defendant] was the one who pulled the trigger and it wasn't him."

¶ 47    Austin Reid next testified. Reid had a criminal history, including convictions for aggravated DUI, possession of a stolen vehicle, burglary, theft, possession of a weapon by a felon, and multiple convictions for forgery. At the time of trial, Reid was incarcerated. Reid was in a "physical relationship" with Hart. Reid testified that Hart spoke with him about her "baby daddy" Waters. Hart told Reid that Waters "went to hit a lick"—meaning, to rob someone—but that Waters "shot somebody and killed them." Hart told Reid that she would "say whatever she had to say to get [Waters] out of jail." Reid testified that he was serving a sentence in the Illinois Department of Corrections and did not receive any benefit from his testimony.

11

¶ 48    Next, Tyler McPherson testified. McPherson was friends with defendant for "around a decade." McPherson was with defendant on August 26, 2017, where the two attended a party to watch a UFC fight. McPherson testified that defendant wore baggy pants during the fight watch, and the pants were weighed down by defendant's phone. Therefore, McPherson testified that defendant likely did not have a firearm in his pocket during the party, which would weigh down his pants.

¶ 49                              4. Jury Instructions

¶ 50    During the jury instruction conference, the State sought to admit People's Instruction No. 14, on accountability. The State argued that their main position was that defendant fired the gun that killed the victim. However, the State charged the offense under the theory of accountability. Defendant objected to the instruction, noting: "I think the State needs to pick a theory and not go on every potential theory." The circuit court determined that there was "some evidence" to support the instruction, offering it over objection. Therefore, the circuit court allowed People's Instruction No. 14, Criminal IPI 5.03, which stated:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of an offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.
> The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

¶ 51    Next, the State sought to admit People's Instruction No. 15. Defense counsel objected to the instruction, where it might "confuse" the jury. Over objection, the circuit court also allowed People's Instruction No. 15, Criminal IPI 5.03A, which stated:

> "To sustain the charge of first degree murder, it is not necessary for the State to show that it was or may have been the original intent of the defendant or one for whose conduct he is legally responsible to kill the deceased, Zachery Hubbart.
> It is sufficient if the jury believes from the evidence beyond a reasonable doubt that the defendant and one for whose conduct he is legally responsible combined to do an

12

unlawful act, such as to commit armed robbery, and that the deceased was killed by one of the parties committing that unlawful act."

¶ 52    The State sought to offer People's Instruction No. 25 regarding the defendant being armed. Defense counsel objected to the use of the language in the instruction of "one for whose conduct he was legally responsible," noting that defendant "either personally discharged the firearm or he did not." The State responded that the instruction went "to the accountability issue." The circuit court noted that the instruction was appropriate where one can "still be convicted" "under the accountability theory." Defense counsel raised an ongoing objection to all instructions with accountability language.

¶ 53    The circuit court instructed the jury related to first degree murder.

¶ 54                                    5. Closing Arguments

¶ 55    During closing arguments, the State noted that the law of this case was "complex." The State noted that it was the jurors' job to assess the credibility of the witnesses and to determine which pieces of evidence to believe. The State argued that "under the law" "there are different ways you can be guilty of the same thing." The State continued that with a charge of first degree murder "there are four different theories that apply to whether or not someone might be guilty of the offense of first degree murder." The State continued: "If any one of them applies, then the defendant is guilty of first degree murder."

¶ 56    The State argued that it presented testimony which suggested that defendant was the shooter in this case. However, the State acknowledged that Waters' testimony could be viewed with skepticism, given he was involved in the crime. While acknowledging that "it is our main theory of the case that [defendant] was the one who shot the gun that killed Zach Hubbart," the State noted that even if the jurors believed that defendant did not shoot the gun, he was accountable for the person that committed the murder.

13

¶ 57    The State read the jury the accountability jury instruction and described accountability as "a person is legally responsible for the conduct of another when either before or during the commission of an offense and with the intent to promote or facilitate the admission of that offense, he knowingly solicits, aids, abets, agrees to aid or attempts to aid the other person in the planning of the commission of the offense."

¶ 58    The State also commented on the video recorded interview of Brandt. Brandt did not cooperate during his testimony. However, the State played a video recorded statement, wherein Brandt indicated that defendant was the man who shot Hubbart. Brandt's video recorded statement also corroborated Waters' testimony that defendant gave Waters $1000.

¶ 59    Next, during defendant's closing argument, defense counsel argued that the State failed to prove beyond a reasonable doubt that defendant knew that the robbery would result in a murder. Defense counsel argued that Waters was not credible, where he had the highest motive to lie. Defense counsel argued that Waters "came up with the idea of the robbery on his own."

¶ 60    As to accountability, defense counsel argued that defendant "thought he was doing a cannabis deal." Defense counsel argued that defendant "was not trying to do a robbery." Counsel continued: "[Defendant] had no idea what [Waters] was planning ***."

¶ 61    During rebuttal closing argument, the State argued that the jury could consider Brandt's video recorded statement as "substantive evidence." Additionally, the State stated:

> "[STATE'S ATTORNEY]: *** All right. Getting back then to the point I was originally trying to get to, and that is that if you talk about this idea of accountability *** Ryan Waters [codefendant] or Jason White [defendant] was the actual shooter. He is still accountable even under the best circumstance for what the defense is claiming. Because he assisted—did he aid or [abet] in the commission of the crime? He helped clean up afterwards.
>
> [DEFENSE COUNSEL]: Objection.
>
> THE COURT: What's your objection?

14

[DEFENSE COUNSEL]: I would argue that the statement of the law on accountability [*sic*].

THE COURT: Overruled. Go ahead, Mr. Rueter [(State's Attorney)]."

¶ 62 The State continued argument, explaining why cleaning up was part of the People's theory leading to defendant's accountability for the murder of Hubbart, whether defendant or his codefendant shot the gun:

"STATE'S ATTORNEY: *** Accountability, ladies and gentlemen, involves assisting someone until they are free of the crime scene, and helping clean up that crime scene is helping them get away with the crime. That's aiding and abetting."

¶ 63 The State continued to argue that defendant was "in full knowledge that there was a robbery going on here." The State noted that defendant may not have known "there was going to be a murder" but that defendant was "certainly responsible in firing the gun."

¶ 64                                                    6. Verdict

¶ 65 Relevant to this appeal, during deliberations, the jury sent the following question: "Does the phrase 'promote or facilitate the commission of an offense' include the act of cleaning and/or covering up?" Defense counsel argued that the question indicated that the State ill-advised the jury on the law of accountability during closing argument, where the law states that "you're accountable for the actions of either before or during the commission of an offense." The State responded that its understanding of the law indicated that "accountability exists until there is a successful getaway" which the State interpreted as "until all the evidence is wiped away in this case." The court responded to the jury: "You have received the jury instructions which contain the legal definitions of all issues pending in the case. Please continue with your deliberations."

¶ 66 Following over six hours of deliberation, the jury returned a verdict of guilty of first degree murder. The jury found that defendant, or one for whose conduct he is legally responsible, was armed with a firearm was proven. The jury found defendant not guilty of armed robbery. The jury

15

found that the allegation that defendant personally discharged a firearm that proximately caused death to another person was not proven beyond a reasonable doubt.

¶ 67    Defendant filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. Relevant to this appeal, defendant argued that the State misstated the law during closing arguments, where the State argued that defendant's actions in returning to the scene to clean up and dispose of evidence made him responsible for the murder. Defendant argued that this error was apparent where the jury sent a question asking the court to clarify whether cleaning up was "during the commission" of the offense. Defendant also argued that the evidence was insufficient for a finding of guilt beyond a reasonable doubt.

¶ 68                                    C. Sentencing

¶ 69    Following evidence and argument, the circuit court sentenced defendant on the offense of first degree murder (720 ILCS 5/9-1(a)(1) (West 2016)) to 50 years in prison, served 100%, with 3 years of mandatory supervised release. Specifically, the court sentenced defendant to 35 years for first degree murder plus a 15-year firearm enhancement.

¶ 70    On December 17, 2021, defendant filed a motion to reconsider sentence, which the circuit court denied. This timely appeal followed.

¶ 71                                    II. Analysis

¶ 72    On appeal, defendant raises three contentions of error. First, defendant argues that the prosecutor's rebuttal closing argument confused the jury and deprived him of a fair trial. Second, defendant argues that the circuit court committed reversible error where it failed to clarify the law of accountability for the jury. Third, defendant argues that the circuit court erred by allowing the State to publish to the jury portions of Matthew Brandt's videotaped statement to police. For the reasons that follow, we disagree.

16

¶ 73                          A. Rebuttal Closing Argument

¶ 74    First, defendant argues that the prosecutor erred during closing argument when he
suggested that defendant was still accountable for Waters' actions simply because he helped
Waters "clean up afterwards." Defendant contends that this argument misstated the law of
accountability, confused the jury, and deprived defendant of a fair trial. The State responds that
the prosecutor did not misstate the law regarding accountability during closing argument.
Alternatively, the State argues that defendant is not entitled to a new trial as a result of any
perceived error. We disagree with defendant, where the prosecutor did not misstate the law and
the jury was properly instructed.

¶ 75    Generally, the prosecution has wide latitude in making its closing argument. *People v.
Nicholas*, 218 Ill. 2d 104, 121 (2005). The prosecutor may comment on the evidence and any fair,
reasonable inferences from it, even if those inferences reflect negatively on the defendant. *Id*.
However, a closing argument must serve a purpose beyond inflaming the emotions of the jury. *Id*.
"A closing argument must be viewed in its entirety, and the challenged remarks must be viewed
in their context." *Id*. at 122. "A prosecutor's comments in closing argument will result in reversible
error only when they engender 'substantial prejudice' against the defendant to the extent that it is
impossible to determine whether the verdict of the jury was caused by the comments or the
evidence." *People v. Macri*, 185 Ill. 2d 1, 62 (1998). If the jury could have reached a contrary
verdict had the improper remarks not been made, or if this court cannot say that the State's
improper remarks did not contribute to the defendant's conviction, a new trial should be granted.
*People v. Wheeler*, 226 Ill. 2d 92, 123 (2007).

¶ 76    However, prosecutors are not permitted to misstate the law. See *People v. Brooks*, 345 Ill.
App. 3d 945, 950 (2004). A defendant arguing that reversal of his conviction is warranted on the

17

basis of improper closing argument faces a difficult burden. *People v. Gutierrez*, 402 Ill. App. 3d 866, 895 (2010). Even when a defendant objects at trial to all of the remarks he challenges on appeal, reversal is warranted only if those remarks resulted in substantial prejudice to the defendant. *People v. Abadia*, 328 Ill. App. 3d 669, 678 (2001).

¶ 77    Illinois courts have acknowledged an apparent conflict between two Illinois Supreme Court decisions on the appropriate standard of review to apply in this case. Compare *People v. Blue*, 189 Ill. 2d 99, 128 (2000) (applying an abuse of discretion standard), with *People v. Wheeler*, 226 Ill. 2d 92 (2007) (applying a *de novo* standard). More recently, the First District held that no conflict existed between *Blue* and *Wheeler*. See *People v. Cook*, 2018 IL App (1st) 142134, ¶¶ 61-62. Defendant requests that this court review the issue *de novo* pursuant to *Wheeler*. Rather, the holdings in both cases establish that we apply an abuse of discretion standard in reviewing the trial court's ruling on the propriety of the challenged remarks, and a *de novo* standard in reviewing whether any misconduct was egregious enough to warrant a new trial. *Cook*, 2018 IL App (1st) 142134, ¶¶ 61-62. Taking these principles into consideration, we find the prosecutor's comments do not warrant a new trial.

¶ 78    Turning to the merits, to prove that a defendant had the intent to promote or facilitate the crime, the State must present evidence that establishes, beyond a reasonable doubt, "that (1) the defendant shared the criminal intent of the principal or (2) there was a common criminal design." *People v. Willis*, 2013 IL App (1st) 110233, ¶ 79. The common design rule holds that "where two or more persons engage in a common criminal design or agreement, any acts in the furtherance of that common design committed by one party are considered to be the acts of all parties to the design or agreement and all are equally responsible for the consequences of the further acts." *In re W.C.*, 167 Ill. 2d 307, 337 (1995). "Words of agreement are not required to prove a common design

18

or purpose between codefendants; a common design may be inferred from the circumstances surrounding the crime." *Willis*, 2013 IL App (1st) 110233, ¶ 79. "Evidence that a defendant voluntarily attached himself to a group bent on illegal acts with knowledge of its design supports an inference that he shared the common purpose and will sustain his conviction for an offense committed by another." *In re W.C.*, 167 Ill. 2d at 338. "A conviction under accountability does not require proof of a preconceived plan if the evidence indicates involvement by the accused in the spontaneous acts of the group." *People v. Cooper*, 194 Ill. 2d 419, 435 (2000). "In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene." *Willis*, 2013 IL App (1st) 110233, ¶ 79. " 'Absent other circumstances indicating a common design, presence at the scene and flight therefrom do not constitute *prima facie* evidence of accountability; however, they do constitute circumstantial evidence which may tend to prove and establish a defendant's guilt.' " *Id.* (quoting *People v. Foster*, 198 Ill. App. 3d 986, 993 (1990)). A defendant may be found guilty under an accountability theory even though the identity of the principal is unknown. *Cooper*, 194 Ill. 2d at 435.

¶ 79    Defendant argues that the prosecutor's statements regarding cleaning the crime scene were error. The prosecution maintained its theory that defendant himself was the shooter. However, as an alternate theory, the State charged defendant, and the circuit court instructed the jury, on an accountability theory. Reading the prosecution's rebuttal closing argument as a whole, the State merely argued that the crime was not completed until the parties escaped from the scene. "In determining a defendant's legal accountability, the trier of fact may consider the defendant's presence during its commission, the defendant's continued close association with other offenders

19

after its commission, the defendant's failure to report the crime, and the defendant's flight from the scene." *Willis*, 2013 IL App (1st) 110233, ¶ 79. In the instant case, defendant and Waters were indisputably together during the commission of the offense, continued close association with one another throughout the evening of August 26, 2017, and early morning hours of August 27, 2017, failed to report the crime, fled from the scene, and went back to the scene to destroy evidence of their involvement. The prosecutor's arguments were based on reasonable inferences from the evidence.

¶ 80    Although we maintain the comment was proper, we note that any prejudice flowing from the comment is minimal. First, the comment was isolated to a few lines in a lengthy rebuttal argument. Second, the circuit court correctly instructed the jurors regarding the law on accountability pursuant to Illinois Pattern Jury Instructions, Criminal, No. 5.03. Not only did the circuit court instruct the jury, but also the prosecutor read the instruction in its entirety to the jury. Correct jury instructions are typically sufficient to cure any prejudice that might arise from an isolated misstatement such as this remark. See *Brooks*, 345 Ill. App. 3d at 950. Therefore, where the prosecutor's statement was not in error, and where the jury was properly instructed, reversal is not warranted. The prosecutor's comments were not so prejudicial as to warrant a new trial.

¶ 81                                B. Deliberations

¶ 82    Second, during deliberations, the jury sought clarification of the law of accountability by sending a note asking whether the phrase "promote or facilitate the commission of an offense" included the act of cleaning and/or covering up after the shooting. Defendant argues that in light of the prosecutor's misstatement of accountability during closing argument, the circuit court committed reversible error by failing to clarify the law for the jury. The State responds that the circuit court properly declined to give additional jury instructions regarding the issue of

20

accountability beyond the instructions contained in the Illinois Pattern Jury Instructions as to that issue. We agree with the State.

¶ 83     A trial court has a duty to instruct a jury that shows confusion or doubt about the law, where the jury has asked an explicit question or requests a clarification of the law arising from the facts. *People v. Childs*, 159 Ill. 2d 217, 229 (1994). This duty exists even in circumstances where the jury has been properly instructed. *Id.* However, under appropriate circumstances, a trial court may exercise its discretion to refrain from answering a jury's question. *People v. Millsap*, 189 Ill. 2d 155, 161 (2000). Appropriate circumstances would include situations where "the instructions are readily understandable and sufficiently explain the relevant law," "further instructions would serve no useful purpose or would potentially mislead the jury," the jury's question is one of fact not law, or giving an answer would cause the court to "express an opinion that would likely direct a verdict one way or another." *Id.*

¶ 84     Determining the propriety of a trial court's answer to a jury question is a two-step analysis. *People v. Leach*, 2011 IL App (1st) 090339, ¶ 16. First, the trial court's decision on whether to respond to a jury's question is reviewed for an abuse of discretion. *Id.* Second, we must determine whether the trial court's response to the jury's question was correct, and our review is *de novo*. *Id.*

¶ 85     In the instant cause, the jury asked: "Does the phrase 'promote or facilitate the commission of an offense' include the act of cleaning and/or covering up?" Defense counsel argued that the question indicated that the State ill-advised the jury on the law of accountability during closing argument, where the law states that "you're accountable for the actions of either before or during the commission of an offense." The State responded that its understanding of the law indicated that "accountability exists until there is a successful getaway," which the State interpreted as "until all the evidence is wiped away in this case." The court responded to the jury: "You have received

21

the jury instructions which contain the legal definitions of all issues pending in the case. Please continue with your deliberations."

¶ 86    The record is clear that the circuit court discussed the jury's question with both parties. In his brief, defendant even admits that the "parties agreed to respond by telling the jury it had received instructions that contain the legal definitions of all the issues pending before them, and to continue deliberating." We cannot say that the court's decision to answer the question by directing the jury to review the jury instructions was an abuse of discretion under the circumstances of this case. See *People v. Averett*, 381 Ill. App. 3d 1001, 1012 (2008) (the trial court has discretion in determining how best to respond to a jury question). The court's response was an accurate answer to the jury's question, as the circuit court was being asked a mixed question of facts and law. As such, the circuit court did not err in its response to the jury's question, where the instructions were readily understandable and sufficiently explained the relevant law.

¶ 87                          C. Evidentiary Issues

¶ 88    Third, defendant contends that the circuit court committed plain error when it instructed the jury to consider Matthew Brandt's videotaped statement to police as substantive evidence. Specifically, defendant argues that the circuit court erred by allowing the State to publish to the jury portions of Matthew Brandt's videotaped statement to police, including that defendant shot Zachary Hubbart, and that defendant and Waters wiped down the crime scene and disposed of evidence. Defendant contends that, where Brandt was relaying statements from Waters and lacked personal knowledge of the events, the court committed plain error when it instructed the jury to consider the evidence substantively under section 115-10.1 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10.1 (West 2018)). The State responds that there was no error, let

alone plain error, caused by the admission of Matthew Brandt's videotaped statement to police as substantive evidence under section 115-10.1 of the Code.

¶ 89    Defendant concedes that this issue is forfeited but asks this court to review the alleged error under the first prong of plain error. Where defendant acknowledges that he did not object to the evidence or raise it in a post-trial motion, this issue is forfeited. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). However, this court may consider the otherwise forfeited issue under the plain-error doctrine. *Id.* That doctrine allows us to overlook forfeiture of issues "when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence." *Id.* The first prong of the plain-error test is applicable in cases where the evidence is so closely balanced that the claimed errors alone were sufficient to "tip the scales of justice" against the defendant. *People v. Sebby*, 2017 IL 119445, ¶ 51. The second prong is applicable if any of the claimed errors were serious enough to undermine the fairness of the defendant's trial or the integrity of the judicial process itself. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 90    Even assuming error occurred here, in reviewing the claim under the first prong of plain error, we cannot find that the evidence was closely balanced. The jury heard significant evidence demonstrating that defendant contacted Waters to set up a robbery of Hubbart, wherein defendant and Waters would pretend to engage in a cannabis exchange for money. It was undisputed that defendant and Waters entered the home together without cannabis to exchange for the money, someone fired a gun, and the victim died. Moreover, defendant and Waters destroyed evidence and cleaned the crime scene together. Defendant also gave Waters $1000 following the murder. The only question left unresolved was who the shooter was. Regardless, under accountability theory, this evidence is more than sufficient for the jury to find defendant committed the offense

23

of first degree murder and that he, or one for whose conduct he was legally responsible, was armed with a firearm.

¶ 91    Defendant also argues that trial counsel provided ineffective assistance for failing to preserve this issue at trial. Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced: that the evidence is so closely balanced that the alleged error alone would tip the scales of justice against him, *i.e.*, that the verdict "may have resulted from the error and not the evidence" properly adduced at trial. See *Herron*, 215 Ill.2d at 178 (plain error); see also *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (there was a "reasonable probability" of a different result had the evidence in question been excluded).

¶ 92    Upon a review of the record, it is clear that defendant cannot show prejudice. Both an ineffective assistance analysis and a closely balanced prong of plain error analysis are "evidence-dependent and result-oriented." *People v. White*, 2011 IL 109689, ¶ 134. Even if we assumed, *arguendo*, that there was error in the admission of Brandt's video-recorded statement, the evidence against defendant is such that he cannot show prejudice for purposes of either analysis. Accordingly, we need not resolve whether there was error here because, under a closely balanced analysis, above, defendant fails to establish prejudice.

¶ 93    For these reasons, we conclude that defendant failed to satisfy his burden to show that the evidence was closely balanced and that plain error occurred. Therefore, we affirm defendant's conviction for first degree murder.

¶ 94                                                    III. Conclusion

¶ 95    For the foregoing reasons, defendant's Macon County conviction for first degree murder is affirmed.

¶ 96    Affirmed.